Ok Nyo REXRODE, Plaintiff-Appellee,

United States of America, Intervenor,

v.

AMERICAN LAUNDRY PRESS CO., and its successor corporation McGraw Edison Company, Defendant-Appellant.

No. 80–2217.

United States Court of Appeals,
Tenth Circuit.

March 12, 1982.

Rehearing Denied April 22, 1982.

Jerry K. Levy of Levy & Freeman, Topeka, Kan. (Steven Hornbaker of Harper & Hornbaker, Chartered, Junction City, Kan., with him on the brief), for plaintiff-appellee.

C. Willing Browne of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo. (Robert E. Musgraves, Denver, Colo., and J. Steven Pigg and Donald Patterson of Fisher, Patterson, Sayler & Smith, Topeka, Kan., with him on the brief), for defendant-appellant.

Before SETH, Chief Judge, and McWILLIAMS and SEYMOUR, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is a products liability case with jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332 (1976). A jury returned a verdict in favor of the plaintiff, Ok Nyo Rexrode, and against the defendant, American Laundry Press Company, and its successor corporation, McGraw Edison Company, in the amount of $750,000. McGraw Edison appeals the judgment entered against it.[1]

The plaintiff, Mrs. Rexrode, was employed by the United States in a government-operated laundry facility located at Fort Riley, Kansas. She was injured on August 17, 1977, at the Fort Riley laundry when a laundry press manufactured by the defendant's predecessor closed on her hand while she was operating it.[2] The press was

---

1. The United States of America intervened in this action as a party plaintiff pursuant to Fed. R.Civ.P. 24(a)(1) and 42 U.S.C. § 2651 (1976). 42 U.S.C. § 2651 authorizes the United States to recover from third-party tortfeasors the reasonable value of medical costs and treatment the government has furnished to injured persons. Subsection (b) of § 2651 provides that the United States may enforce its right to re-covery, *inter alia*, by intervening in any action brought by the injured person against the third-party tortfeasor. The United States incurred expenses totaling $17,570 on behalf of Mrs. Rexrode, who was a military dependent, and that amount was deducted from her award.

2. The press was in fact manufactured by the Ajax Pressing Machine Company which was acquired by American Laundry Press prior to

sold to the United States by the American Laundry Press Company on or about June 1, 1959, and was installed and continually used thereafter by the United States at its Fort Riley facility.

Mrs. Rexrode, who sustained severe injuries in the accident, brought the present action against the manufacturer of the press, and its successor company, claiming that the press was manufactured and sold in an unreasonably dangerous and defective condition.[3] On appeal, the defendant presents four issues for review. We shall discuss each.

## I. Other Accidents

The machine used by Mrs. Rexrode was a Model 1057 PY–SP yoke press which had a main control mechanism assembly known as "A 178." The press is activated when the operator depresses two red buttons located at opposite ends of the press head. As a safety precaution, the red buttons are spaced so that two hands are required to engage the main control assembly mechanism.

Depressing both red buttons opens two pneumatic valves to permit air to fill a cylinder which in turn drives the press head downward. The operator must continuously engage both red buttons as the press head descends until the press reaches the "lock position," approximately four inches above the buck. Once the machine enters the lock mode, the press will close automatically and the operator may release the red buttons.[4] Activating either one of two green buttons, also located on the press head, will cause the head to ascend immediately.

Mrs. Rexrode alleged in this case that the press head descended on her hand even though she had not activated the two red operating buttons which normally must be depressed before the head will move toward the buck.

In order to ascertain whether other cases existed in which plaintiffs were injured when a press head descended mysteriously, the plaintiff propounded interrogatories to the defendant requesting information regarding past and present injury claims filed against the defendant involving laundry presses with "the same or similar main control mechanism assembly" as the press which was the subject of the suit.[5] The defendant initially responded to these interrogatories by stating that it was unaware of any suits or claims involving "the model press which is the subject matter of this law suit." Dissatisfied with that answer, plaintiff filed a motion to compel answers, which was granted on July 30, 1979. The defendant then filed a supplemental answer in which it stated that there were two such cases. A second supplemental answer listed an additional eleven cases in which persons had been injured by a laundry press with the same or similar main control mechanism

1959. In 1967 the Ajax Division of American Laundry Press merged with the McGraw Edison Company and the successor corporation became known as McGraw Edison.

3. Kansas has adopted the rule of strict liability as set forth in § 402A of the Restatement (Second) of Torts (1965). *Brooks v. Dietz*, 218 Kan. 698, 545 P.2d 1104, 1108 (1976). That section provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold,

(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

4. Requiring two hands to operate the press until the head reaches the lock position prevents operators from trying to "beat the ram." Testimony at trial indicated that it is impossible to beat the ram once the machine enters the lock mode.

5. Apparently, the "A–178" main control mechanism assembly was used on many other models, and on larger presses as well as yoke presses.

assembly. A third supplemental answer listed one additional suit, bringing the total to fourteen lawsuits involving claims against the defendant which were possibly similar to plaintiff's claim.

On January 16, 1980, the plaintiff filed a notice to take the deposition and request for production of documents of George Schmidlin, an attorney employed by the defendant. A hearing for protective order in response to this notice was held on February 6, 1980. The court at that time ordered the defendant to produce all files of claims, exclusive of privileged communications, involving Ajax Press Machine Company presses which used a system of depressing two press head buttons simultaneously and an A–178 or A–220 [6] main control mechanism assembly. Accordingly, the defendant was required to produce answers to interrogatories from the 1977 case of *Miles v. American Laundry Machinery Industries*, a case which was discovered in the files which Mr. Schmidlin brought to the February 12, 1980, deposition. Interrogatory 16 of the *Miles* case requested that the defendant list all prior suits or claims for damages filed against the defendant alleging injuries occasioned by similar products. The answer listed seventeen cases, only two of which had been identified previously in the defendant's supplemental answers to the plaintiff's interrogatories.[7]

On the first day of trial, the defendant filed a motion *in limine* seeking the exclusion of evidence relating to other claims and lawsuits against the defendant.[8] The defendant argued that testimony regarding additional press accidents should not be admitted at all, unless and until the plaintiff demonstrated that the other accidents were sufficiently similar to the one at bar to be relevant.[9] The court ruled that no other press accident cases would be allowed into evidence unless proof of the circumstances involved could be established by direct testimony of a witness with firsthand knowledge of the case, and unless relevancy was established by evidence that the other accident involved substantially the same circumstance as the present case.[10]

---

**6.** Ajax replaced the "A–220" assembly with the "A–178" assembly sometime between 1956 and 1958.

**7.** We recognize that the subject matter of the *Miles* interrogatory request was much broader than the trial court's protective order of February 6, 1980, in this case.

**8.** Defendant's motion *in limine* reads as follows:

Comes now the defendant and moves the Court for an order prohibiting plaintiff's counsel from making reference to any suits filed against the defendant or American Laundry Machinery Company, its division, concerning others who have been injured on presses manufactured by it, for the reason that such reference in opening statement, voir dire examination, examination of any witness, is irrelevant, immaterial, inadmissible, and highly prejudicial unless and until the qualifications set forth on page 14 of Defendant's Trial Brief, and its Supplemental Trial Brief on Admissibility of Other Suits against the Defendant are met.

**9.** Under both federal and Kansas law, it is clear that evidence of the occurrence of other accidents involving substantially the same circumstances as the case at issue is admissible, pursuant to a strict liability theory, to establish notice, the existence of a defect, or to refute testimony by a defense witness that a given product was designed without safety hazards. *McKinnon v. Skil Corp.*, 638 F.2d 270, 277 (1st Cir. 1981); *Wojciechowski v. Long-Airdox Div. of Marmon Group, Inc.*, 488 F.2d 1111, 1116 (3d Cir. 1973); *Jones & Laughlin Steel Corp. v. Matherne*, 348 F.2d 394, 401 (5th Cir. 1965); *Prashker v. Beech Aircraft Corp.*, 258 F.2d 602, 608 (3d Cir.), *cert. denied*, 358 U.S. 910, 79 S.Ct. 236, 3 L.Ed.2d 230 (1958); *Schaeffer v. Kansas Department of Transportation*, 227 Kan. 509, 608 P.2d 1309, 1317 (1980). Admission of testimony regarding other accidents is usually predicated upon a showing that the circumstances surrounding them were substantially similar to those involved in the present case. *Julander v. Ford Motor Co.*, 488 F.2d 839 (10th Cir. 1973).

**10.** After argument, the trial court inquired of defense counsel as to whether counsel for plaintiff wouldn't have the right to cross-examine defense expert witnesses who had investigated the "other claims," to which defense counsel replied: "Certainly. He hasn't asked those people any of those questions yet is my point." In this setting the trial court granted the motion *in limine*, in part, with the following comment:

I will tell you, I am going to partially grant this motion as to any instances that are only available through bare pleadings, then the

At trial, plaintiff's counsel was able to reveal to the jury the existence of several other press injury cases filed against the defendant by asking defense expert witnesses who had investigated some of the accidents whether they had worked on any of the cases which he would list orally by the caption name. Frequently, the witness had investigated some of the cases named, in which event counsel pursued the matter in an effort to demonstrate that the "other accidents" were comparable to the one sustained by the plaintiff. Where the witness stated that he had nothing to do with the investigation of a particular claim, however, counsel did not pursue the matter in any detail. Defense counsel interposed certain objections during this cross-examination, some of which were sustained. The objections which were overruled did not relate to matters of great import, and, to us, this particular line of cross-examination played a minor role in the trial. As illustrative of this, counsel for plaintiff in his closing argument to the jury made *no* mention of any other accident.

■ On appeal, counsel for the defendant, who did not participate in the trial, attempts to make much of the cross-examination of defendant's expert witnesses regarding other accidents, and, indeed, urges the matter as his first and primary ground for reversal. Specifically, counsel asserts that the trial court erred by failing to require plaintiff's counsel to lay the necessary foundation *outside* the presence of the jury before he made reference to other claims made against the defendant.

We are not persuaded by the argument. While we agree that it might be preferable to hold a hearing on the relevancy of other accidents outside of the jury's presence, we believe this approach is by no means mandated in every instance.[11] We are aware that the Supreme Court of Kansas has endorsed the procedure urged by the defendant here,[12] but the federal district court below was not bound by that endorsement, as the matter is one concerning procedural and not substantive law. *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ Moreover, defendant's assertion that the effect of revealing names of other cases to the jury in this instance is tantamount to the error which occurred in *Julander v. Ford Motor Co.* is unavailing. In the *Julander* case, this Court reversed a lower court decision *to admit into evidence* complaints against the defendant, Ford, without determining whether the other steering defect claims had occurred under circumstances substantially similar to the case at issue. 488 F.2d 839, 845–47 (10th Cir. 1973). By contrast, defendant's objection here pertains to the mere mention of case names by plaintiff's counsel in front of the jury.[13] This is not to say that statements by counsel can never have a prejudicial impact on a jury verdict warranting reversal, *c.f. Cleveland v. Peter Kiewit Sons' Co.,* 624 F.2d 749, 758 (6th Cir. 1980); *County of Maricopa v. Maberry,* 555 F.2d 207, 217–20 (9th Cir. 1977); *O'Rear v. Fruehauf Corp.,* 554 F.2d 1304, 1309 (5th Cir. 1977); however, it is our

Court directs that the plaintiff not refer to them in any manner. *However, that does not limit him on cross-examination or examination of witness that have been investigating cases of this type to, if they are similar and if he can make them relevant, then I think they have a probative value and they will be handled in that way.* And I direct counsel, and I know he will limit his opening statement to that restriction and we will have no problem. (emphasis added).

**11.** Contrary to defendant's assertion, the trial court did not violate its own *in limine* order by failing to hold a separate hearing to determine the admissibility of evidence of other claims.

The trial court's order makes no mention of a hearing outside of the presence of the jury, (see n. 10, *supra*), and a review of the record reveals that defendant below made no request for such procedure.

**12.** *See Schaeffer v. Kansas Department of Transportation,* 227 Kan. 509, 608 P.2d 1309, 1317 (1980); *Hampton v. State Highway Commission,* 209 Kan. 565, 498 P.2d 236, 246 (1972).

**13.** Statements made by counsel are, of course, not evidence and the jury was cautioned on that point in this case. Instruction No. 27.

conclusion that this particular line of cross-examination played a minor role in the course of trial. Thus any error which occurred was harmless.

## II. The 1972 Industry Standard

At trial, plaintiff introduced evidence, without objection, of a 1941 safety standard relating to laundry presses established by the American National Standards Institute (ANSI) [14] and of a 1972 federal regulation proposed by OSHA.[15] All parties agreed that the Rexrode press violated the 1941 ANSI standard and the OSHA regulation with regard to protection for nonoperators. Moreover, expert witnesses for the defendant conceded on cross-examination that had the press complied with the 1941 standard, Mrs. Rexrode would not have been severely injured.

■ Defendant contends that the 1941 industry standard, which was in effect at the time the press was manufactured in 1959, established safety standards beyond the state of the art of the industry at that time. Defendant in turn sought to introduce evidence of a less stringent 1972 ANSI standard, arguing that the press fully complied with its more technically feasible requirements.[16] The trial court on several occasions refused to admit the 1972 ANSI standard or to permit testimony regarding it. Defendant argues failure to admit the ANSI standard constituted reversible error.[17]

■ Defendant does not challenge either the admission of the 1972 OSHA standard or the 1941 ANSI standard.[18] It claims, however, that it should have been permitted to introduce a 1972 ANSI standard to prove that "the machine was in full compliance with the more recent standards, and to demonstrate that the earlier standards were an inaccurate reflection of the state of the industry." We disagree.

■ First, the issue of manufacturer compliance with industry standards is generally considered to be irrelevant in a strict liability case. Rather, it relates to the question of the manufacturer's duty of care under a negligence theory. *See Raney v. Honeywell, Inc.,* 540 F.2d 932, 937–38 (8th

14. The American National Standards Institute is an organization which publishes national nonmandatory standards for various products.

The 1941 ANSI standard for ironing presses provides that:

Each ironing press (excluding hand or foot power) shall be equipped with an approved guard or means that will prevent the fingers of the operator or other person from being caught between the ironing surfaces.

15. The regulation was promulgated pursuant to the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.* (1976), which authorized the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce.

The 1972 OSHA regulation is codified at 29 C.F.R. § 1910.212 under the heading of General Requirements for all machines:

(a) *Machine guarding*—(1) *Types of guarding.* One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, . . . .

(3) *Point of operation guarding* (1) Point of operation is the area on a machine where work is actually performed upon the material being processed.

This OSHA regulation imposes mandatory standards on *employers* and *employees*, and not manufacturers.

16. The 1972 ANSI standard did not require point of operation guarding for nonoperators.

17. The threshold question to be resolved is whether Kansas or federal law should be applied to determine the admissibility of subsequently promulgated industry standards in diversity design defect cases. In *Fabian v. E. W. Bliss Co.,* 582 F.2d 1257 (10th Cir. 1978), this Court adopted the position that state evidentiary law will be applied to determine admissibility of industry standards in diversity strict liability cases. *Id.* at 1260–61. (by implication). As no Kansas court to date has addressed this issue, this Court must determine what result probably would be reached if the question were litigated in the state court. *Julander v. Ford Motor Co.,* 488 F.2d at 844.

18. Nonetheless, it is clear that in determining an issue of defective design a jury properly may consider evidence that a product *violated* safety standards which were in effect on the date of manufacture. *Davis v. Fox River Tractor Co.,* 518 F.2d 481, 484 (10th Cir. 1975).

Cir. 1976). In the main, the cases here relied on by the defendant involve claims based on negligence, rather than strict liability. *See, e.g., Stonehocker v. General Motors Corp.*, 587 F.2d 151, 157 (4th Cir. 1978); *Garst v. General Motors Corp.*, 207 Kan. 2, 484 P.2d 47, 61 (1971).[19] *Jones v. Hittle Service, Inc.*, 219 Kan. 627, 549 P.2d 1383, 1389–90 (1976), relied on by the defendant, holds that evidence of compliance by a defendant with a state regulation, which was stipulated to by the parties, does not conclusively prove that such defendant was not negligent or that the propane gas there involved was not defective. *Garst v. General Motors Corp., supra*, cited with approval in *Jones*, indicates that compliance with an industry practice tends to negate an allegation of negligence.

■ The second prong of defendant's argument for admitting the 1972 ANSI standard relates to feasibility, a factor which we would agree is extremely relevant in a design defect determination. Manufacturers are not to be held strictly liable for failure to design safety features, if the technology to do so is unavailable at the time the product is made. *See generally* 96 A.L.R.3d 22, 35–40 (1980).

■ The difficulty with defendant's argument here lies with the fact that in 1972

OSHA also proposed standards which mandated the same protection as the 1941 standard. Moreover, in response to this OSHA proposal, defendant manufactured and marketed a safety device, the cable kit, which when installed would bring existing presses in compliance with the Act. Given that the plaintiff offered into evidence and proved the existence of the 1972 OSHA standard and the cable kit, which was marketed by the defendant, defendant's proffer of the 1972 ANSI standard to establish that in 1972 certain safety measures were infeasible was untenable.[20] Similarly, any relevance which the 1972 ANSI standard might have had to prove the technological infeasibility within the industry to comply with the 1941 ANSI standard *in 1959* was at best remote. Indeed, at trial the court sustained an objection by the defendant to the introduction of a 1961 ANSI standard as irrelevant "post-sale" evidence. (T.R. 160). In our opinion, the trial judge properly excluded the 1972 ANSI standard under Rule 403 of the Federal Rules of Evidence, as it was of limited relevance and likely to confuse the jury. *See Rigby v. Beech Aircraft Co.*, 548 F.2d 288, 293 (10th Cir. 1977).

### III.  Instruction No. 24

■ Defendant also appeals Jury Instruction No. 24 in which the court stated

---

**19.** The case of *Clement v. Rousselle Corp.*, 372 So.2d 1156 (Dist.Ct.App.1979), *cert. denied*, 383 So.2d 1191 (Fla.1980), does support defendant's position. In this regard, however, *see Murphy v. L & J Press Corp.*, 558 F.2d 407, 411–12 (8th Cir. 1977). We are more persuaded by *Murphy*.

**20.** To prove defendant had the capability to manufacture guards for presses which complied with the 1972 OSHA requirements of point of operation guards for nonoperators as well as operators, plaintiff introduced the following correspondence, sent by the defendant to its field representatives on February 11, 1972:

"The Williams-Steiger Occupational Safety & Health Act requires that certain safety devices be incorporated on all laundry presses. The law requires that all presses shipped from our factory after February 15, 1972, be equipped with these devices. It requires that all presses in use in the field be so equipped. The penalties are heavy for violation! It is very important that all dealers and distributors have a good understanding of the re-

quirements; and, in all their proposals to customer, take into consideration the added cost necessary to comply with the law.

Each dealer or distributor should appraise his inventory of equipment on hand in his warehouse which was shipped from AJAX prior to February 15, 1972, and determine for himself if it is necessary to so equip these presses before they are delivered.

AJAX has developed a kit for the various laundry presses that we manufacture and to the best of our knowledge complies with the Act. We also have available a kit that can be adapted to competitive presses.

The kit consists of a cable that extends around the head of the press which, when it comes in contact with the operator's hand or a second party's hand, will immediately return the press to an open position. The press must then be reset to continue operation. The enclosed sketch gives you further information and a description of how this device operates, together with list prices. . . ."

that plaintiff's life expectancy as of the date of the accident was 29.2 years. The judge indicated that the figure was given for the purpose of assisting the jurors in the computation of future damages and losses. Defendant complains that this instruction directed the jury to compute plaintiff's future losses and damages from the date of accident rather than from the date of trial, thus allowing double recovery for the interim between accident and trial. We disagree.

The instructions should be read together, as a whole, in determining whether a party was prejudiced by them. The trial court properly instructed the jury to compute separately damages for pain and suffering, medical expenses, and loss of income accrued, and future damages. In light of such instructions, we assume that the jury recognized the distinction between damage already incurred, and future damage, and, in connection with the latter, adjusted downward the life expectancy figure so as to give effect to the fact that there was a three-year interval between the date of accident and the date of trial. At least we are unwilling to assume the contrary. *Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp.*, 571 F.2d 1144, 1149 (10th Cir. 1978).

## IV. Insufficiency of Evidence

Defendant's final contention is that the evidence is legally insufficient to support the verdict. Counsel asserts that plaintiff's evidence only established that she suffered a hand injury when, for some inexplicable reason, the press head descended. In our view, the plaintiff's evidence showed much more than just that. The plaintiff offered expert testimony to establish a design defect under several different theories, including, failure to install a so-called cable kit, or perimeter wire, which would cause the press head to rise if it contacted a part of an arm or a hand.[21] Defendant's experts conceded that Mrs. Rexrode would not have been injured if the press had been equipped with a safety cable kit.

Plaintiff also introduced evidence tending to prove that defendant failed to include adequate maintenance instructions and warnings with the press when it was shipped to Fort Riley in 1959 for installation. Defendant presented evidence that the Humpfrey valve, upon which the cable kit design was predicated, was not developed until the 1960's. However, the jury was instructed to consider feasibility and the "state of the art" for the industry at the time the press was manufactured. The mere fact of continuous use of a product without injury is not, by itself, conclusive evidence that the product was not defective. *Sterner AERO AB v. Page Airmotive, Inc.*, 499 F.2d 709 (10th Cir. 1974). In short,

---

**21.** At trial plaintiff introduced evidence of possible defective design under the following theories:

1. The theory that the machine was defective because it was not equipped with the so-called cable kit, or perimeter wire, which would cause the head to ascend if it contacted part of an arm or hand.

2. The theory that the mysterious descent of the head, when coupled with proof of normal maintenance and lack of substantial alteration, established that some defect must have existed.

3. The theory that one of the valves which opens to permit air to fill the cylinder which in turn drives the press head downward became stuck open when a particle momentarily lodged in its port. Defendant demonstrated that the likelihood the accident occurred in this fashion is negligible, since the press head would not have ascended upon depression of the green button, as Rexrode testified it did, until the foreign matter was removed from the valve.

4. The theory that failure to design the press to include a nonadjustable safety rod contributed to the plaintiff's injury. Rexrode presented evidence that use of an adjustable rod allowed the machine to be set so that it went into the lock position some distance above the pressing surface. Once the press locks, the press head will descend without depression of the red buttons.

Defendant introduced some proof that this particular defect, if it was indeed a design error at all, could not have been the cause in fact of the Rexrode accident.

5. The theory that the machine was defective because the defendant's predecessor delivered it to Fort Riley without adequate maintenance instructions and warnings. Plaintiff also argued that defendant violated a continuing duty to warn by failing to notify Fort Riley directly of a new safety feature, the cable kit, which it had developed.

in considering the evidence in a light most favorable to the plaintiff, drawing all reasonable inferences and resolving all factual conflicts in accord with support for the verdict, *Gardner v. General Motors Corp.*, 507 F.2d 525, 527 (10th Cir. 1974), it cannot be said that plaintiff failed to advance evidence sufficient to require submission of the matter to the jury. The evidence supports the verdict.

Judgment affirmed.