Eldee EDWARDS, Jr., et al., Plaintiffs,

v.

CONSOLIDATED RAIL CORPORATION, Defendant.

Civ. A. No. 82–1874.

United States District Court, District of Columbia.

July 7, 1983.

Van S. Powers, Hyattsville, Md., for plaintiffs.

Stephen A. Trimble, James B. Sarsfield, David M. Moore, Hamilton & Hamilton, Washington, D.C., for defendant.

## MEMORANDUM ON SUMMARY JUDGMENT

OBERDORFER, District Judge.

### I

On July 7, 1979, plaintiff Eldee Edwards, Jr. (hereinafter "plaintiff"), who was 11 years old at the time, climbed on top of one of defendant's trains and was seriously injured by exposure to a high-voltage electric wire ("catenary wire") that was suspended 18½ feet above the tracks and supplies power to defendant's through trains. Invoking federal diversity jurisdiction, plaintiff and his father instituted this action through their guardian *ad litem,* plaintiff's grandfather. They seek $250,000 in special damages on behalf of the plaintiff's father, and $20 million in compensatory damages and $50 million in punitive damages on behalf of the child. Six months of discovery are now complete and the facts and law have been well developed in pretrial pleadings. Defendant now moves for a summary judgment that the undisputed material facts establish that it cannot be held liable in this case as a matter of law. Plaintiffs have opposed the motion, and a hearing on the motion was held on May 15, 1983.

Plaintiff suffered tragic and serious injuries when he was shocked by defendant's catenary wire. Nevertheless, as explained below, the accompanying Order will grant defendant's motion on the authority of

§ 339 of the Restatement (Second) of Torts (1965), which is controlling in this jurisdiction under the *en banc* decision in *Holland v. B & O R. Co.,* 431 A.2d 597 (D.C.Ct.App. 1981).[1] In brief, the following facts are undisputed:

(a) plaintiff trespassed onto the track area and train where he was injured;

(b) children trespassing by bicycle on the site where plaintiff was injured, including plaintiff, were not deterred by the "no authorized vehicle signs" posted along the only access road to the site or by "no trespassing" signs stencilled on each catenary wire pole;

(c) the wire which caused plaintiff's injury was suspended 18½ feet above the tracks and was "ordinarily inaccessible." Plaintiff's Pretrial Brief (filed April 19, 1983) at 195;

(d) only "through trains" use the tracks where plaintiff was injured, and the only possible means of access to the catenary wire was by climbing onto one of defendant's through trains during the brief and random minutes when the trains must occasionally stop there for a signal;

(e) the Secretary of Transportation has plenary authority to require fencing and additional posting at such sites, but has conspicuously refrained from doing so; and

(f) defendant has voluntarily fenced its rail yards and tracks or "de-energized" its catenary wires at other urban sites where the catenary wires are more accessible to trespassing children.

Based on these undisputed facts, a rational jury could come to only certain conclusions under § 339:

(1) that defendant neither knew nor had reason to know that the wire 18½ feet above the tracks at the site where plaintiff was injured would be accessible or involved an "unreasonable risk" of harm to trespassing children (Restatement § 339(b));

(2) that the utility of the catenary wire and the burden of "eliminating" the risk of

1. Restatement (Second) of Torts § 339 is re- printed in full *infra* at pp. 1101–1102.

injury from it are not "slight" compared with the risk that a through train would stop at that place long enough for a trespassing child to climb on top of the train and be injured by the wire (Restatement § 339(c)); and that

(3) defendant had no statutory or common law duty under federal or District of Columbia law to fence, place guards, or post more signs at the site where plaintiff was injured to protect against a tragic incident such as the one at issue here, and was exercising "reasonable care" in its maintenance of the site (Restatement § 339(e)).

## I

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). The undisputed facts and "inferences to be drawn" from those facts "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). "The court may not weigh or resolve issues of fact," *Rodway v. United States Department of Agriculture,* 482 F.2d 722, 727 (D.C. Cir.1973), and to support summary judgment the record "must demonstrate that [the] opponent 'would not be entitled to [prevail] under any discernible circumstances.'" *National Ass'n of Governmental Employees v. Campbell,* 593 F.2d 1023, 1027 (D.C.Cir.1978) (quoting *Semaan v. Mumford,* 335 F.2d 704, 705 n. 2 (D.C.Cir.1964)). *See also International Underwriters, Inc. v. Boyle,* 365 A.2d 779, 782 (D.C.App.1976) (summary judgment standards in District of Columbia).

Rule 56 also requires that when a motion for summary judgment is filed that is adequate to support judgment, an opposing party must specifically defend against that motion. Rule 56(e) provides that, in such a case, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." F.R.Civ.P. 56(e). As our Court of Appeals has stated, "in order to raise a material issue of fact ..., more is necessary tha[n] mere assertions in the pleadings." *Bloomgarden v. Coyer,* 479 F.2d 201, 208 (D.C.Cir.1973); *cf. National Ass'n v. Campbell, supra,* 593 F.2d at 1029. Summary judgment on issues that are more often left for a jury is generally appropriate "where the facts are undisputed and only one conclusion may reasonably be drawn from them." *Flying Diamond Corp. v. Pennaluna & Co., Inc.,* 586 F.2d 707, 713 (9th Cir.1978); *accord Bloomgarden v. Coyer, supra,* 479 F.2d at 212 (summary judgment appropriate where there is "no basis on which a jury could rationally find" otherwise); *Quinto v. Legal Times of Washington,* 506 F.Supp. 554, 564 (D.D.C.1981) (summary judgment appropriate "where only one inference is possible from the evidence"). *See* pp. 1112–1114, *infra.*

In furtherance of Rule 56(e), this judicial district has enacted Local Rule 1–9(h), which provides as follows concerning the obligation to defend against summary judgment with specificity:

> With each motion for summary judgment ... there shall be served and filed ... a statement of the material facts as to which the moving party contends there is no genuine issue.... A party opposing such a motion shall serve and file ... a concise "statement of genuine issues" setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, and shall include therein references to the parts of the record relied upon to support such statement. *In determining a motion for summary judgment, the court may assume that the facts as claimed by the moving party in his statement of material facts are admitted to exist except as and to the extent that such facts are controverted in a statement filed in opposition to the motion.*

(Emphasis supplied.) Plaintiffs' counsel has not filed the statement required by Rule 1–9(h), and his six-page opposition to defendant's comprehensive motion merely restates plaintiffs' legal contentions, without referring to any specific facts.

Our Court of Appeals has made it clear that "failure to file a proper Rule 1–9(h) Statement ... may be fatal to the delinquent party's position." *Gardels v. Central Intelligence Agency,* 637 F.2d 770, 773 (D.C. Cir.1980). Yet when the Court called the failure to counsel's attention at the argument on the motion for summary judgment, he simply acknowledged his failure, stating that "we felt that perhaps we should refer, by incorporation, to other pleadings filed." Transcript at 46 (May 16, 1983). He has not subsequently designated specific facts that may exist in the record or in his 225-page Pretrial Brief to point out material issues which remain disputed and would preclude summary judgment. In *Gardels, supra,* our Court of Appeals stated that courts may require "strict compliance" with Rule 1–9(h), and that its "purposes clearly are not served when one party ... fails in his statement to specify the material facts upon which he relies and merely incorporates entire affidavits and other materials without reference to the particular facts recited therein which support his view." 637 F.2d at 773.

Were this case not so tragic and it was not an injured infant plaintiff who would

suffer from counsel's failure, summary judgment could be granted for defendant on this procedural failure alone, as defendant's motion and 1–9(h) statement are more than adequate to justify such a ruling. Because of these special circumstances, however, the Court has conducted an independent and detailed review of the record, including the filed depositions, discovery responses, pleadings and plaintiffs' overlong and largely unhelpful Pretrial Brief.[2] The facts as presented below reflect the Court's best judgment as to the most favorable case that plaintiffs could draw from the record. *See Habib v. Raytheon Co.,* 616 F.2d 1204, 1208 (D.C.Cir.1980). Evidence presented by defendant that has not been challenged is accepted as true, but the Court has disregarded any facts proffered by defendant for which a contest is factually suggested anywhere in the record. Even after this exhaustive review of the record, the Court is convinced that plaintiffs could not prevail were a jury to hear the undisputed facts, and that defendant must be granted judgment as a matter of the law governing in the District of Columbia.

## FACTS

On the afternoon of July 7, 1979, the 11-year-old minor plaintiff and three friends of the same general age[3] rode on their bicycles to the railroad tracks which lay between RFK Stadium and the Anacos-

---

**2.** Plaintiffs' 225-page pretrial brief lists 82 witnesses and over 580 separately numbered purported factual statements. Only one of the factual statements, the first, relates specifically to the incident at issue in this case. It reads in its entirety: "Eldee Edwards, Jr., was burned from electricity from the catenary system in Washington, D.C.[,] operated and/or maintained by the defendant on July 7, 1979, near the Sousa Bridge." *Id.* at 49. This fact is not contested by defendant; neither would it establish defendant's liability if proved at trial. Plaintiffs have also provided a brief two-page narrative account of the incident in a different section of their pretrial brief under the inexplicable heading "Legal Contention No. 5." *Id.* at 183–84. This two-page presentation of facts in a 225-page pretrial brief also fails to state specific facts relating to this minor plaintiff's accident that would establish defendant's liabil-

ity in this case under the governing D.C. law. In contrast, plaintiffs have devoted 68 separately numbered statements of fact to an account of an accident that occurred to a minor a year earlier, under different circumstances, and over two miles away from where plaintiff was injured. *Id.* at 53–61. The facts of this accident are irrelevant to this case and would be inadmissible at trial, *see* pp. 1106–1107, *infra,* and the paucity of relevant facts in the Pretrial Brief reflects the unbalanced use of resources that plagued counsel and the Court during the discovery period in this action.

**3.** Plaintiff was approximately 11 years and 9 months old on the date of the incident, and had completed the 6th grade with a B or C average. His companions on July 7, 1979, were Wayne Childress (12 years, nine months old), Tyrone Brown (11 years, 11 months old), and Andre

tia River, east of the Sousa Bridge, in the District of Columbia. They rode to the stadium, through the stadium parking lot, and onto a path or road. Plaintiffs' Pretrial Brief at 183. They passed a sign at the entrance to that road that bore the words "No Unauthorized Vehicles." One of the plaintiff's friends saw the sign; plaintiff did not. Brown Deposition at 10; Eldee Edwards, Jr. Deposition at 22. They followed the road for about one-half mile (Brown Deposition at 10) past the D.C. Jail, behind the D.C. General Hospital, behind a fenced cemetery and down toward defendant's railroad tracks. They then came to a grassy area. Beyond this grassy area lay the railroad tracks; on the far side of the tracks was another grassy area and then the Anacostia River.

A train was stopped on the tracks, extending beneath the bridge and awaiting clearance for passage through the Virginia Avenue tunnel. Plaintiff and two of his friends rode their bicycles off the road and over the grass next to the tracks and dismounted.[4] Accepting plaintiff's testimony as true, this train had been stopped there when the boys arrived; the train was stopped there for about twenty minutes

prior to the accident.[5] All three boys climbed up ladders on the sides of the railroad cars. Wayne Childress and Andre Stukes climbed up the ladders but not onto the top of the railroad cars; Childress put his head above the roof level of a car, and Stukes climbed up the ladder only "halfway." Childress Deposition at 17; Stukes Deposition at 31. Stukes stopped "[b]ecause I was scared, I was afraid it was too high up there. I was afraid I was going to fall." Stukes Deposition at 31.

Plaintiff was still climbing a car when the other two boys had finished climbing.[6] Unlike the other two boys, plaintiff climbed all the way onto the top of a car, and stood up. He walked around a little, became "a little dizzy," and started to leave. Edwards Deposition at 44, 47. Plaintiff remembers that Stukes said to him "Come on. Let's go." Id. Both Childress and Stukes told plaintiff not to climb onto the last car; Stukes stated that he was afraid of falling and said to plaintiff "Get down, man, before you fall." Stukes Deposition at 32; see id. at 36; Childress Deposition at 19, 32. All three boys stated in deposition that they neither thought about nor realized the danger in the wires.[7]

Stukes (12 years, 10 months old). Most of the evidence favorable to plaintiffs is found in the depositions of these four boys. Because the claims of the minor plaintiff's father for medical expenditures on behalf of his son depend entirely on whether the son can recover, the minor will be referred to as the "plaintiff" hereafter.

**4.** Plaintiff's friend Tyrone Brown refused to ride closer to the train, because "something told me to stay up there [on the road]" and "maybe the police would see us getting on the train ... and try to lock them up." Brown Deposition at 14–15. Brown proceeded to ride his bicycle under the bridge and did not see the injury to plaintiff occur. Id. at 28–29.

**5.** Plaintiffs have never proffered evidence as to how long, specifically, the train was stopped. Defendant's records indicate that the train was stopped for seven minutes before the accident; a fisherman witness, Charles Riddick, who was deposed by defendant, said that the train was stopped "for 20 minutes or better" and that was the longest period of time he had seen a

train stop there in 10 years. Riddick Deposition at 5, 31, 36.

**6.** Plaintiff may have climbed more than one car. See Stukes Deposition at 36 (three cars); Childress Deposition at 16–19 (two cars); Brown Deposition at 21 (two cars); Edwards Jr. Deposition at 42 (one car and maybe jumped to another).

**7.** Defendant evidently has a statement signed by Stukes after the accident on December 1, 1979, in which Stukes stated that "There were wires hung above the car that the passenger trains use for power. I was afraid he [plaintiff] could get hurt by the wires." Stukes Deposition at 37. This statement apparently was prepared by a railroad official in Stukes' home without counsel present. Stukes appears to have recanted this statement in his deposition for the instant litigation, see id. at 37–41, 57–59, and the Court has disregarded the statement for purposes of this motion.

As plaintiff decided to leave the top of the railroad car, he either grabbed or came quite close to the catenary wires, which were near his head or shoulder level.[8] In any case, "[s]omething went 'Pow,' there was a red flash and ... [plaintiff] was laying across the train, injured." Childress Deposition at 24. He then apparently rolled or fell from the top of the railroad car to the ground next to the tracks, landing on top of one of the bicycles. Stukes Deposition at 56–57. He was severely burned and injured, and has received extensive medical treatment for his injuries. The boys stated that only a few minutes elapsed from when they began to climb the cars until plaintiff was injured.[9]

This was the sixth time that plaintiff had bicycled through this area. His friends had also visited there before on different occasions. They had seen other boys on bicycles there, as well as fishermen along the river and cars on the road from the stadium. Clarence Riddick, who had fished at the site intermittently for over a decade, had also seen children and adults in the area on numerous occasions. Riddick Deposition at 31–34. The area itself, however, appears to be isolated as far as residential housing located directly at the site is concerned. See Defendant's Statement of Material Facts as to which There is No Genuine Issue (hereinafter "Defendant's 9(h) Statement"), Exs. B, C & D (photographs of the site) (filed April 25, 1983). For purposes of summary judgment, this record indicates that the adults and children trespassed in the area not infrequently for recreational purposes.[10]

Plaintiff and his friends stated that they had never seen a standing train on the tracks in their previous visits to this area. Thus they had never before climbed on a train there (or anywhere else by their testimony). They all stated in deposition that they did not consider trains dangerous, and that they were not aware of the electrical danger contained in the catenary wires above the tracks, although they had seen the wires.

The tracks at the point of the incident are "mainline" or "through" tracks. Twenty to

---

**8.** Plaintiff has stated that he "grabbed" the wire for no particular reason, although he was "a little dizzy." Edwards Jr. Deposition at 52. Brown stated that he had been told by Childress that plaintiff "looked like he was going to fall or something and he caught onto one of [the wires]." Brown Deposition at 29. Childress stated that he did not actually see how plaintiff came into contact with the electricity. Childress Deposition at 24. At a discovery conference, plaintiffs' counsel indicated to that Court that his expert medical testimony would suggest that plaintiff did not actually come into contact with the wire, but that he came close and the electric current "arced" into his body.

**9.** Clarence Riddick, the fisherman who witnessed the accident stated an account of the incident in deposition that differed in some respects from the version in the text, which has been developed in large part from the depositions of the four boys. Riddick stated that the train had been stopped for about 20 minutes, and that the boys had been climbing on, in, and through the cars for about 15 minutes, although none of the boys climbed on top of a car until plaintiff did and was injured. Riddick and his fishing companion Laura Watkins both stated that they yelled at the boys two or three times to "get off the train," and that they specifically yelled at plaintiff to get off the car on which he was injured. Although they believed that the boys heard them because the boys looked at them when they yelled, the boys did not heed the warnings or say anything in response. The boys stated in deposition that they did not hear anyone yell at them or tell them to get off the train before plaintiff was injured.

**10.** Defendant proffers that its witnesses would testify otherwise at trial. Defendant's former Special Police Officer McCabe stated in deposition that he patrolled this area as part of his regular duties, that he did not recall ever finding trespassing children within one-half mile of the spot where plaintiff was injured, and that he considered it to be "one of the most isolated" areas he "had on the railroad." McCabe Deposition at 80, 83. Other of defendant's officials testified similarly that the area where plaintiff was injured was not known for having child trespassers. See Beyer Deposition at 128, 132; Mitchell Deposition at 59–60; Memorandum in Support of Defendant's Motion for Summary Judgment (April 25, 1983) at 21–22 (hereinafter "Defendant's Memorandum"). This evidence would be for the jury, and must be disregarded at this stage.

twenty-eight through trains pass there every day. Trains are not stored, loaded or switched in the area nor are there side tracks there for such purposes. Trains stop there only en route when required by signals for operational purposes of the railroad.[11]

The high-voltage catenary wires supply defendant's trains with electric power through devices mounted atop the electric locomotives. Of necessity, the wires are not insulated. This catenary system has been in place above railroad tracks in Washington, D.C., since the mid-1930s. At the site where plaintiff was injured, the wires are suspended 18½ feet above the ground, and are "ordinarily inaccessible." Plaintiffs' Pretrial Brief at 195. At bridges or ground-level storage areas and other places where catenary wires would be accessible to pedestrians, defendant has either erected fences or cement walls, or "de-energized" the wires (i.e. turned off the current). Otherwise, the wires are suspended out of normal reach.[12] *See* Defendant's 9(h) Statement, ¶ 14; Plaintiffs' Pretrial Brief at 16, 19–20 (summarizing testimony of witnesses Ginter and Shertzer). On the poles from which the catenary lines are suspended the words "No Trespassing" have been stencilled; these words were faded or rusted so as to be obscured in some places.

Certain facts regarding railroad safety requirements and defendant's compliance with them are also undisputed. First, in 1970, Congress enacted the Railroad Safety Act, 45 U.S.C. §§ 421, 431–444 (1976 & Supp. V 1981), Pub.L. 91–458, 84 Stat. 971 (Oct. 16, 1970) (hereinafter "the Act"). Congress's expressed purpose in enacting the Act was "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons ...." 45 U.S.C. § 421. The Act gave broad investigative, regulatory and enforcement powers to the Secretary of Transportation, *see id.,* §§ 431–440, who in turn delegated authority to the Federal Railroad Authority ("FRA") to implement and administer the Act. *See generally United Transportation Union v. Lewis,* 711 F.2d 233 (D.C.Cir.1983). One section of the Act required the Secretary to submit to the President and Congress "a comprehensive study of the problem of eliminating and protecting railroad grade crossings, *including a study of measures to protect pedestrians in densely populated areas along railroad rights-of-way,* together with his recommendations for appropriate action." 45 U.S.C. § 433(a) (emphasis supplied). The Act gave the Secretary authority to develop and implement solutions to these safety problems, *see* §§ 433(b), 437, but, in commenting on the need for safety regulations, the House Committee noted that it had "no intention to induce the Department [of Transportation] to prescribe regulations which will later turn out to be impractical or impossible." H.R.Rep. No. 91–1194, 91st Cong., 2d Sess. 18, *reprinted in* 1970 U.S.Code Cong. & Admin.News 4104, 4115.

The required report was filed in 1972. Federal Railroad Administration, *Report to Congress, Railroad-Highway Safety Part II: Recommendations for Resolving the Problem* (U.S. Dept. of Transportation) (August 1972) (partial copy attached as Ex. A to Defendant's 9(h) Statement). Although the

---

**11.** Plaintiffs claim that such stoppages are "common," Pretrial Brief at 184, but state no factual basis for that conclusion. Defendant proffers evidence that such stops at the point in question were uncommon. *See* Defendant's Memorandum at 23. Riddick's deposition testimony, *see* note 9, *supra,* as well as the boys testimony that they had never before seen a train stopped there, and the uncontradicted representation that these were "through tracks" are all evidence supporting defendant's proffer. There are no *facts* in the record to the contrary.

**12.** A photograph of the site attached to defendant's 9(h) statement (Exhibit D) indicates that the poles from which the catenary wires are suspended have no rungs on them for climbing; furthermore, no trees or other high, climbable objects are near the wires. Plaintiffs make no claim that there were such rungs or other means of access.

FRA had considered fencing and posting of signs at railroad rights-of-way as a possible solution to the problem of pedestrian deaths and injuries, including catenary injuries (*see id.* at 52), it expressly declined to recommend these alternatives to Congress. *Id.* at 53, 56–57. Instead, it reported the expense that would be involved in fencing some 30,000 miles of urban rights-of-way ($2.3 billion in 1972), noted the lack of assurance that fencing would be effective in preventing pedestrian access, and suggested further study before specific regulations were enacted. *Id.* at 55–57. The problem of catenary injuries to trespassers was noted in one sentence in the 108-page report, *id.* at 52, but no specific solutions were suggested, let alone adopted. No regulations to require fencing or signing have been promulgated subsequently by the FRA, and Congress has not imposed any such statutory requirements, even though it has twice amended the Act (in 1976 & 1980).[13]

It is also undisputed that the District of Columbia has not enacted any fencing requirements or other safety regulations for railroad rights-of-way or catenary wires within the District, despite the fact that the Act expressly preserves the power of state authorities to regulate local railroad safety problems. *See* 45 U.S.C. § 434.

Moreover, it is also undisputed that despite the absence of statutory or regulatory requirements, defendant has voluntarily instituted an active safety protection program in areas where trains are stored or where catenary wires come into normal reach. Defendant's voluntary actions in this regard have included construction of fences and walls, posting of "high-voltage" warning signs, and de-energizing of the catenary wires. *See* Plaintiffs' Pretrial Brief at 13–14, 16, 19–20 (summarizing testimony of witnesses Feeley, Beyer, Ginter and Shertzer); Hasselman Deposition at 24–25, 42–43, 86; Defendant's 9(h) Statement, ¶ 14. Thus it is undisputed that defendant was in compliance with all existing federal and local safety requirements at the site and on the date of plaintiff's accident, and that throughout its railroad system defendant has gone beyond statutory requirements in the area of catenary safety.

Finally, plaintiffs have proffered uncontested evidence that electrical injuries to minors caused by the catenary wires above railroad tracks have occurred in the past.[14] According to plaintiffs, from 1975 through August 1979 throughout the "northeast corridor" of the Amtrak system (encompassing Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland and the District of Columbia), 101 electrical injuries to trespassers on railroad cars have been reported. Eighty-six of these have been to minors. Seven such incidents have occurred since 1968 within three miles of the point at which plaintiff was injured; two of these happened within one-half mile of the spot. Plaintiffs' Pretrial Brief at 3–8.

For reasons explained more fully below, *infra* at n. 15 and pp. 1096–1097, only the two prior accidents involving minors that occurred near the site where plaintiff was injured are even arguably material here.[15]

---

**13.** In March 1972, the National Transportation Safety Board also recommended that the FRA require fences and "more and better signs," and "promulgate regulations to cover the operation of catenary ... power supply systems." Railroad Accident Report No. NTSB–RAR– 72–3 at ii, 20 (March 29, 1972) (partial copy attached to Defendant's Memorandum). Neither the FRA nor Congress has ever acted on this recommendation.

**14.** The facts the plaintiff proffer in this regard are undisputed for the most part, but are not material or relevant to this action, for reasons explained in detail below at pp. 1105–1107.

**15.** In 1974, the Southeast Freeway was constructed near the site of plaintiff's accident. It is uncontested that that construction placed a multi-lane highway with high walls between the site and the housing near the site, from which access to the site had formerly been direct. Access to the site across the Congressional cemetery has also been restricted by a fence since 1974. *See* Defendant's Reply (filed May 16, 1983) at 5. The record is uncontradicted that no catenary accident occurred at

In March 1973, William S. Fearing was injured by catenary wires while climbing on a railroad car which may have been stationary "a few hundred yards north" from the site of plaintiff's accident. Plaintiffs' Pretrial Brief at 5.[16] In June 1968, seven-year-old Jeffrey Windom (now Jeffrey Harrison) was injured when he climbed a standing railroad car and came into contact with the catenary wires within three-tenths of a mile of the same site. Plaintiffs have proffered no more specific evidence regarding the circumstances of these two accidents, although the Court has examined Windom's deposition.

An additional undisputed fact is that in subsequent litigation of the Windom incident, Judge Richey of this Court granted a directed verdict in favor of the defendant railroad, Penn Central; that judgment was affirmed on appeal. *Windom v. Penn Central,* No. 479–72 (D.D.C. Feb. 21, 1973) (partial transcript attached to Defendant's Memorandum in Support), *aff'd without opinion,* 494 F.2d 1157 (D.C.Cir.1974). In his decision rendered from the bench in *Windom,* Judge Richey noted that "railroads . . . are not insurers of property" and need not "endure unbearable burdens to maintain [their] property or a railroad line." *Id.,* transcript at 412. He therefore granted judgment as a matter of law, holding that the railroad had not breached its duty of reasonable care, and that "the issue of reasonableness is for the court because of the uncontroverted facts in this case which permit only a single inference to be drawn." *Id.* at 414–15.

## II

By analogy to the reasoning in *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), federal courts in the District of Columbia exercising diversity jurisdiction must apply the substantive law of the District as announced by its highest court. *Steorts v. American Airlines, Inc.,* 647 F.2d 194, 196–97 (D.C.Cir.1981); *Lee v. Flintkote Co.,* 593 F.2d 1275, 1278–79 n. 14 (D.C.Cir.1979). Analysis of this case must therefore begin with consideration of the *en banc* decision of the District of Columbia Court of Appeals in *Holland v. B & O Railroad Co.,* 431 A.2d 597 (D.C.Ct.App.1981).

The *Holland* decision resolved a long controversy concerning the applicable standard of liability in the District of Columbia for landowners in cases of injury to trespassers. In 1953 the United States Court of Appeals for the District of Columbia (sitting as the highest court in this jurisdiction) adopted the strict common law standard that trespassers may recover only in cases of "intentional, wanton or willful injury." *Firfer v. United States,* 208 F.2d 524, 528 (D.C.Cir. 1953). In 1972, however, the United States Court of Appeals suggested that common law distinctions between trespassers and other persons were "alien to modern tort law," and that a single standard of "reasonable care under the circumstances" should be applied in cases of injury to any person when present on another's land. *Smith v. Arbaugh's Restaurant, Inc.,* 469 F.2d 97, 100–101 (D.C.Cir.1972). In *Holland,* a nine-

---

the site from 1974 until plaintiff's accident in 1979. In light of the remoteness in time of the prior accidents, the changed circumstances since their occurrence, and the confusing and prejudicial effect that their introduction could have on a jury, evidence of these two accidents would be excluded at trial as a matter of law under Fed.R.Evid. 401 & 403. *See infra* at pp. 1105–1107.

16. Plaintiff has alleged that the car on which Fearing was injured was "standing," Pretrial Brief at 4–5, but has provided no facts to support this assertion. Defendant has stated on two occasions that Fearing "hopped a moving

train," *see* Answers to Plaintiffs' Second Set of Interrogatories at 3, ¶ 9 (May 9, 1983); Defendant's Reply to Plaintiff's Opposition at 2, ¶ (e) (May 16, 1983) (Attachment: Memorandum on Admissibility). Plaintiffs' bare assertion need not be accepted under these circumstances. *See* F.R.Civ.P. 56(e) ("adverse party" to summary judgment motion "may not rest upon . . . mere allegation . . ., but his response . . . must set forth specific facts"). Nevertheless, the Court has considered the Fearing accident as a prior similar accident for purposes of this memorandum.

year-old boy was injured by a moving train while trespassing on the unfenced tracks of two railroads. The trial court had granted summary judgment in favor of the railroads, relying on the strict standard of *Firfer;* on appeal, the plaintiff argued that the less stringent standard of *Arbaugh's* should have been applied.

The District of Columbia Court of Appeals rejected the plaintiff's argument, both as a matter of precedent and as a matter of law. First, on February 1, 1971, the courts of the District of Columbia had been reorganized, and after that date the United States Court of Appeals was no longer the binding arbiter of District of Columbia law. The D.C. Court of Appeals held in *Holland* that, because *Arbaugh's* was decided by the U.S. Court of Appeals after the date of court reorganization (and, incidentally, because *Arbaugh's* facts did not involve a trespasser), the decision was not controlling and the *Firfer* decision remained the law of the District. *Holland,* 431 A.2d at 600; *see M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.App. 1971). The *Holland* court therefore rejected "[t]he attempt in *Arbaugh's* to rewrite the general law of tort liability of landowners in the District of Columbia." 431 A.2d at 600. Second, after consideration of the differing standards of liability set forth in *Firfer* and *Arbaugh's,* the *en banc* court refused to abandon common law distinctions between trespassers and other entrants onto land. "In this jurisdiction, trespassers may, generally speaking, only recover from landowners for injuries that were willful, wanton, or that resulted from maintenance of a hidden engine of destruction." *Holland,* 431 A.2d at 601.

Having made the decision to adhere to the strict common law standard of recovery for trespasser cases, the *Holland* court then went on to consider whether an exception to the rule might apply in the case before it. Because the case involved a minor, the

court authoritatively stated that the "narrow exception" of the "attractive nuisance" doctrine, as spelled out in § 339 of the Restatement (Second) of Torts, could be invoked.[17] That section, however, was to be "strictly applied, and [permits liability] only when all five elements of the section [§ 339] are satisfied." *Id.* at 602. Applying § 339 to the facts in *Holland,* the court held that "a moving train is a danger so obvious that any nine-year-old child allowed at large would readily discover it and realize the risk involved." *Id.* at 603. Therefore, the court ruled that as a matter of law under § 339(c), no trespassing minor can recover for injuries caused by a moving train in the District of Columbia. The grant of summary judgment for the railroad was consequently affirmed. *Id.*

Having decided that requirement (c) of Restatement § 339 was not satisfied, the *Holland* court stated that it was "unnecessary to consider whether other elements of" § 339 were also satisfied. *Id.* at 603 n. 11. The court noted, however, that

> courts have consistently held that in the absence of statutory requirements[,] railroads are generally under no duty to erect fences or maintain other safeguards and that, therefore, allegations [in a child-trespasser case seeking recovery on the basis of a failure to safeguard railroad tracks] do not satisfy the requirements of the Restatement rule.

*Id.* This observation made by the highest court in the District of Columbia sitting *en banc,* while undeniably dictum, is still entitled to considerable weight in this Court in the absence of more direct statements of local law.

Three judges dissented in *Holland,* and their views complete the picture of the current state of local law in this type of case. The dissenters' basic point was that, although the particular plaintiff in *Holland* might not have stated facts sufficient to

---

17. Section 339 consists of five subsections setting forth necessary predicates for a finding of liability against a landowner for injuries suffered by a trespassing minor. It is set out in its entirety at pp. 1101–1102, *infra.*

recover under § 339, "rigid" legal rules barring individual consideration of future cases should not be stated. For this reason the dissenters recommended that

> each case concerning a child trespasser and a railroad should ... be decided on its facts under Restatement § 339, ... leaving it to the trial court to grant summary judgment, direct a verdict, or enter judgment notwithstanding the verdict whenever the facts assuredly favor the railroad.

*Id.* at 605 (Ferren, A.J., dissenting). The dissenters argued that "not every child at large ... will appreciate the danger of a train in every setting," and that although "in many if not most locations the addition of warning signals or fences ... would do little to cut down the risks while costing a prohibitive sum," there could be "other locations where the value of additional safeguards might outweigh the costs of installing them." *Id.* at 604.

▮▮▮ Consideration of both the majority and the dissenting opinions in *Holland* leads to several conclusions concerning the present state of District of Columbia law. First, the general rule remains that the trespassers cannot recover unless a landowner's injurious conduct has been "willful or wanton." Second, the "narrow exception" of Restatement § 339 remains available to minors who trespass in the District of Columbia, but that section is to be "strictly applied." Finally, "in many if not most locations," railroads have no duty in the absence of statutory requirement to fence their rights-of-way. To these three points, at least, agreement of the *en banc Holland* court was unanimous.

### III

Before addressing the application of § 339 to plaintiffs' facts here, defendant and plaintiffs attempt to claim judgment as a matter of law on the basis of various federal and District of Columbia statutes relating to railroads. Defendant argues that any local common law remedy that plaintiffs might otherwise have has been preempted by Congress's decision to provide for uniform federal regulation of railroad safety via the 1970 Railroad Safety Act, *supra,* p. 1095, and the decision made pursuant to that Act by the Secretary of Transportation to require neither fencing nor other safeguards at urban railroad rights-of-way such as the one at which plaintiff was injured. At the other extreme, plaintiffs contend that D.C.Code § 7–1434 [18] renders defendant strictly liable for injuries caused by its catenary system.

Although it would seem that the D.C. Court of Appeals' decision to apply common law principles in *Holland* necessarily rejected defendant's preemption argument *sub silentio,* both arguments will be briefly discussed here. Neither argument provides a convincing basis for judgment in this case, although as more fully discussed below, *see infra,* p. 1112, the regulatory decisions made by the Secretary of Transportation under the Act and defendant's compliance with all those decisions as well as all local safety regulations does bear on the reasonableness of defendant's actions for purposes of Restatement § 339(e).

### A. Strict Liability

▮▮▮ Sections 1430–35 of Title 7 of the D.C.Code were enacted by Congress in 1934 as one bill, granting authority to the steam railroads then operating within the District of Columbia "to electrify their lines ... with an alternating current overhead catenary or other type of electrification system." D.C.Code § 7–1430, Act of March 27, 1934 (Pub. Law No. 73–137, 48 Stat. 506–507). Section 1434 provides that

> said railroad companies shall be liable for any accident to, or injuries sustained by, any person by reason of any act or omission of the railroad companies or by their

---

**18.** Plaintiffs' pleadings cite to § 1234 of Title 7. In the 1981 codification of the D.C.Code, however, that section was renumbered as § 1434, and the current D.C.Code contains no § 1234.

agents or servants during the ... operation of the electrical equipment and apparatus of the railroad trains.

A number of factors lead to the conclusion that § 1434 does not impose strict liability on defendant. First, by providing for liability of the railroads for any "act or omission" of the railroads, the plain language of the statute speaks not in terms of strict liability, but rather in the language of negligence, thereby invoking traditional concepts of tort law (which presumably includes the venerable "attractive nuisance" allowance for child trespassers). Thus plaintiffs must prove that an "act or omission" has occurred. Second, the sponsors of the 1934 Act expressed no contemporary intention to create a strict liability scheme, but rather viewed the bill as involving "simply the question of a permit." 73 Cong.Rec. 5426 (March 26, 1934) (remarks of Cong. Byrns.)[19] Third, in the half-century that § 1434 has been on the books, no District of Columbia court has held local railroads strictly liable for electrical injuries to child

trespassers; rather common law negligence principles have been applied. *See, e.g., Windom v. Penn Central, supra.* Finally, the normal factors necessary for application of the doctrine of strict liability are simply not present in this case. *See generally W. Prosser, Handbook of the Law of Torts* 504–540 (4th ed. 1971).[20] Thus strict liability has not been statutorily imposed on railroads for electrical injuries in the District of Columbia.[21]

## B. *Preemption*

■ Defendant contends, however, that even common-law duties of reasonable care have been preempted *sub silentio* by the federal power to regulate all aspects of railroad safety, even though that power has not been exercised with regard to catenary systems. The 1970 Act, *supra* p. 1095, gave the Secretary of Transportation and the FRA broad authority to regulate railroad safety on a uniform, national basis. As defendant points out, the Act requires

---

19. Congressman Byrns' complete statement was that the bill "involves simply the question of a permit to enable this railroad to proceed with the work of electrifying its lines." 73 Cong.Rec. at 5426 (March 26, 1934). The House passed the bill almost immediately thereafter. In the Senate, the bill's sponsor Senator King had previously stated that "the bill is really to relieve one of the nuisances ... namely, large quantities of smoke [from steam engines].... [T]his bill merely gives [the railroad] authority to put electric poles upon its own land within the District." 73 Cong.Rec. at 4888 (March 20, 1934). Nowhere in the brief debates of either house is there any reference to strict liability, or, for that matter, to the specific section of the bill that is now § 1434.

20. For example, strict liability usually requires the "escape" of some abnormal or non-natural dangerous force from the defendant's property. *Prosser, supra,* at 505, 508. The catenary system that has been in use on defendant's railroad for over 40 years might not be considered a "non-natural" use of defendant's land, *id.* at 506–07, and the high-voltage electricity did not "escape" from that land in any case. Moreover, in trespasser cases there generally can be no strict liability when the harm "is realized through unforeseeable intervening causes," *id.* at 520–21, and, as is demonstrated *infra* at pp.

1104–1109, it was not reasonably foreseeable that plaintiff would be injured by a wire suspended 18½ feet above railroad through tracks. Finally, when "sanction [is] given by statutory authority" to a dangerous activity, there can be no strict liability unless there is also a provision "expressly preserving the defendant's liability for any resulting damage," *id.* at 524, although a defendant may still be liable for negligence. D.C.Code § 7–1430 expressly granted authority to District of Columbia railroads to install catenary systems but, as discussed in the text, the language of § 1434 by its terms merely continued the existing common-law negligence liability in operation of such systems.

21. Plaintiffs also argue, in conclusory fashion, that § 1434 sets a standard of conduct, violation of which creates "absolute" liability. Plaintiffs' Pretrial Brief at 164. Section 1434 contains no specific standards of conduct for the operation of catenary systems, however, and plaintiffs cite only cases and Restatement sections that concern violations of specific prohibitory or regulatory statutes, such as *O'Donnell v. Elgin, Joliet & E.R. Co.,* 338 U.S. 384, 70 S.Ct. 200, 94 L.Ed. 187 (1949). Plaintiffs have proffered no other evidence of any specific standards that defendant might have violated. Their argument on this point to the extent it is comprehensible, is frivolous.

that "laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable." 45 U.S.C. § 434. Defendant notes Congress's expressed concern that "[t]o subject a carrier to enforcement before a number of different State administrative and judicial systems in several areas of operation could well result in an undue burden on interstate commerce." H.R.Rep. No. 91–1194, *reprinted in* 1970 U.S.Code Cong. & Admin.News at 4104, 4110–11 (hereinafter "*Legislative History*"). Pursuant to the Act, 226 pages of detailed federal regulations establishing specific safety standards for numerous specific railroad hazards have been promulgated. 49 C.F.R. §§ 200–236.-838 (1982); *see* Defendant's Memorandum at 7–13. When the FRA has issued regulations in other areas, it has announced a preemptive intent at that time, *see, e.g.,* 49 C.F.R. § 225.1 (federal accident reporting requirements are preemptive), and courts have honored such affirmative claims of preemption. *See, e.g., Nat'l Assn. of Regulatory Utility Commissioners v. Coleman,* 542 F.2d 11, 13–15 (3d Cir.1976). It is undisputed, however, that no standard or regulation has been adopted pursuant to the Act to govern railroad catenary systems.

In making the preemption argument, defendant fails to mention that the Act expressly permits the states to "continue in force any law, rule, regulation, order, or standard relating to railroad safety *until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement,*" unless the state regulation or standard is "incompatible" with federal law or creates an "undue burden" on interstate commerce. *Id.* (emphasis supplied). When the House Committee approved this savings clause, it stated that a state could continue to have standards governing particular safety hazards "until the Secretary acts with respect to a particular subject matter." *Legislative History* at 4116.

Defendant does not argue that the FRA has promulgated any regulations on the subject matter of fencing, signing, or other protective mechanisms at railroad rights-of-way with regard to suspended catenary wires; indeed, they argue to the contrary, contending that the absence of federal regulations demonstrates that Conrail has not breached any duty to the plaintiff. Putting aside this latter argument for the moment, the parties are agreed that no federal regulations govern the subject matter at issue here. In similar situations, a number of state courts have held that state common law doctrines continue to govern in the absence of affirmative federal regulations governing particular areas of railroad safety. *See e.g., Henry v. District Court,* 645 P.2d 1350, 1352 (Mont.), *appeal dism'd sub nom Burlington Northern, Inc. v. Henry,* 457 U.S. 1101, 102 S.Ct. 2898, 73 L.Ed.2d 1310 (1982); *Rucker v. Norfolk & Western Ry. Co.,* 77 Ill.2d 434, 33 Ill.Dec. 145, 147, 396 N.E.2d 534, 537 (Ill.1979); *State v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 79 Wash.2d 288, 484 P.2d 1146 (Wash.) (*en banc*), *appeal dism'd* 404 U.S. 804, 92 S.Ct. 108, 30 L.Ed.2d 36 (1971). This was also the holding of the recent Ninth Circuit decision in *Marshall v. Burlington Northern,* No. 81–3161 (April 26, 1983); *cf. Pacific Gas & Elec. v. Energy Resources Comm'n,* —— U.S. ——, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983).

The FRA may well exercise its powers in the areas of fencing or catenary wire safety in the future, but it has not done so. Therefore, although defendant's alleged compliance with all existing safety standards may be relevant evidence as to an absence of liability at common law, *see Rucker, supra,* 33 Ill.Dec. at 147–48, 396 N.E.2d at 536–37, the mere existence of an unexercised power to preempt is not in itself preemptive of any local common law remedies that plaintiff may have in this case.

### IV

In light of *Holland, supra,* determination of plaintiff's claim and defendant's duty in

this case must be governed by the principles of Restatement (Second) of Torts § 339 (1965). Because of that section's importance to this case, it will be set out in full:

§ 339—*Artificial Conditions Highly Dangerous to Trespassing Children:*

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

Section 339 is stated in the conjunctive, and the D.C. Court of Appeals in *Holland* noted that it permits a finding of liability "only when *all five elements* of the section are satisfied." 431 A.2d at 602 (emphasis supplied).[22] After careful consideration of

all the undisputed facts and circumstances of this case, viewed most favorably to plaintiffs, only one possible conclusion could be drawn by a reasonable trier of fact: defendant cannot be held liable under § 339 as a matter of law.[23] Plaintiffs' case fails to satisfy, at the very least, elements (b), (d) and (e) of § 339. Detailed explanation follows, after an initial discussion of plaintiffs' evidence under elements (a) and (c).

A. *Possessor's Knowledge of Trespassers and Child's Knowledge of Danger.*

Plaintiffs have proffered sufficient evidence on elements (a) and (c) of § 339 to present a disputed issue for a jury on those factors. The dangerous condition at issue here is the high-voltage catenary wires suspended 18½ feet above defendant's railroad tracks. In the District of Columbia high-voltage electric wires are considered to be inherently dangerous. *Brown v. Potomac Electric Power Co.,* 236 F.Supp. 815, 817 (D.D.C.1964); *cf. Holland, supra,* 431 A.2d at 603 (referring to the "silent, deadly danger of high-power electricity"). Defendant knows that its catenary wires are dangerous; it maintains a rule that its own employees must never come within three feet of a catenary wire unless they are certain it has been "de-energized."

If "the place where the condition exists" in § 339(a) is considered to be the track and surrounding area where plaintiff and his friends rode their bicycles and climbed on railroad cars, then the most favorable inferences drawn from plaintiffs' facts suggest that defendant knew or had reason to know that child trespassers visited the area with some frequency.[24] The plaintiff, his friends, and the fishermen witnesses all

---

**22.** *Accord Alston v. B & O R. Co.,* 433 F.Supp. 553, 568 (D.D.C.1977) ("The absence of any one required element [of § 339] renders irrelevant an assessment of the landowner's 'reasonableness' and signifies that he is not liable as a matter of law.")

**23.** This conclusion rests on the specific undisputed facts of this case. There is no authoritative statement of law from the D.C. Court of Appeals in a catenary case that would justify an across-the-board conclusion that no minor

plaintiff trespasser can ever recover under § 339 for injuries received from suspended catenary wires. *See Holland, supra,* 431 A.2d at 605 (Ferren, A.J., dissenting) (advocating case-by-case decisionmaking under § 339, while recognizing that summary judgment is an appropriate mode for such a decision).

**24.** Comment (g) to § 339 and the Reporter's Notes make it clear that "[t]he possessor is under no duty to make any investigation or inquiry as to whether children are trespassing,

state that they have visited the area next to the Sousa Bridge many times without obstruction. They have often seen other persons there. The fisherman had seen children there, and had even seen them climb onto (but not on top of) trains. Riddick Deposition at 31, 45–47. Various witnesses have stated that there was a worn path leading to the area where the incident occurred. All these facts, taken together with defendant's evidence that from 20 to 28 trains per day pass through this area, could permit a jury to draw the inference that defendant had reason to know about juvenile trespassers there. Conrail personnel on the trains passing by daily may well have observed children in the area and reported it, and a jury could so find even on this bare record.[25]

Defendant argues for a different interpretation of the language of § 339(a), however. Conrail contends that, in this case, the "place where the condition exists" was located 18½ feet in the air where the wires were suspended, and that defendant had no reason to know that minors were obtaining access to that place. This argument holds some attraction. Plaintiff has proffered no evidence that would support a finding that Conrail had reason to know that children were "likely" to gain access to the catenary wires by climbing on top of through trains

which only occasionally and briefly stopped in that area. Clarence Riddick stated that in 10 years he had never before seen a child climb on top of a train, and the four boys here testified that they had never done so before. Even if evidence of the Windom and Fearing incidents were admissible at trial (and it is not, see pp. 1107–1108, infra), two arguably similar incidents in the previous 11 years cannot reasonably support a finding that such access is "likely," as § 339(a) requires.

The Court need not decide which interpretation of the language of § 339(a) is correct, in light of the dispositive effect that other subsections discussed below have on these facts. The likelihood of minors coming into contact with defendant's suspended wires involves some consideration of foreseeability, an inquiry which merges to some extent with the inquiry as to realization of whether the condition "will involve an unreasonable risk" under subsection (b) of § 339, discussed below.

■ As for subsection (c), plaintiffs' evidence would show that Eldee Edwards, Jr., did not "realize the risk" of coming close to the catenary wire. Plaintiff stated in deposition that he did not realize that the wires were dangerous. This alone creates a triable issue, and it would be for the jury to

---

or are likely to trespass, until he is notified, or otherwise receives information, which would lead a reasonable man to that conclusion." Restatement, Ch. 13, at 201. Plaintiffs' allegation that Conrail "should have known" of child trespassers in the area, Pretrial Brief at 191, employs the exact phraseology that was rejected by the Restatement (Second) authors in favor of the "has reason to know" language. See Restatement (Second) of Torts § 339, Appendix at 130 (Reporter's Notes, # 3). Nevertheless, if a jury were to hear the undisputed evidence and draw favorable inferences for the plaintiff, the "has reason to know" standard could arguably be met here, despite plaintiffs' failure to appreciate its meaning.

**25.** Defendant, of course, disputes this conclusion and proffers evidence to the contrary. See Defendant's 9(h) Statement at 4, ¶ 10; note 10, supra. On summary judgment, however, this evidence must be disregarded; the dispute would be for the jury.

Defendant also cites a recent statement made by the D.C. Court of Appeals regarding the general area at issue here. The court stated that the area in question is not one

"on which the railroad could not have expected to find human activity.... [I]t was not ... near ... [an] area where children ... were known to play or otherwise frequent."

Copeland v. B & O Railroad Co., 416 A.2d 1, 4 (D.C.App.1980). Given that description, the court affirmed a grant of summary judgment against an adult trespasser injured by a train as he lay unconscious on the tracks. Because plaintiff here has adduced more evidence of human activity in the area than was evidently before the court in Copeland, however, that court's description cannot be taken as a dispositive finding in this case.

evaluate the testimony. The Court must take plaintiff's statement as a fact at this summary judgment stage.[26] *See also Prosser, supra,* at 374 (high school-age boys "may reasonably be expected not to appreciate" dangers of high-voltage wires).

## B. *The Risk, the Balance of Burdens, and Reasonable Care.*

Although there are triable disputes with regard to § 339(a) & (c), these disputes are not "material" issues if any one of the other elements of § 339 is not satisfied. And the undisputed facts leave no room for rational doubt that plaintiffs' case fails to satisfy the remaining elements. These elements are interrelated to some extent, and build on much of the same evidence. They will be treated seriatim here, however, in an attempt to present plaintiffs' best case in the clearest manner possible.

### 1. *Section 339(b)*

The second subsection of § 339 embodies an element of reasonable foreseeability: the dangerous condition must also be one "which [the possessor] realizes or should realize will involve an unreasonable risk of death or serious bodily harm to" children. The comments to § 339 make it clear that the dangerous condition must be realized to be "one with which [children] are *likely* to meddle." § 339, comment (e) at 200 (emphasis supplied).

Plaintiffs concede that the wire that injured plaintiff was suspended 18½ feet in the air and was "ordinarily inaccessible." Plaintiffs' Pretrial Brief at 194–95. In *Brown v. Potomac Electric Power Co., supra,* then-District Judge Spottswood Robinson stated the general rule that there is no "duty to insulate . . . properly suspended overhead wires so located that no one could reasonably be expected to come into contact with them." 236 F.Supp. at 819. The area where plaintiff was injured was not a side track or storage yard where trains normally stand for long periods of time; the uncontroverted evidence is that the tracks there are through tracks with at least 20 trains per day passing over them. Plaintiff made no contention and proffered no evidence that trees or other tall structures were close enough to the wires to permit access by climbing or the catenary poles themselves have steps or rungs. Photographs of the site show that there were no such means of access close to the wires. *See* Defendant's Memorandum, Exs. B, C, & D (photographs of the area). It is undisputed that standing trains are the only means of access to the wires available to children at the site.

Further, it is also uncontroverted that through trains were stopped at the site only occasionally and briefly, awaiting signals; the most favorable evidence to plaintiffs is that the train on which plaintiff was injured was stopped for twenty minutes.[27] As the D.C. Court of Appeals stated in *Holland, supra,* " 'the possessor [of railroad tracks] is *free to rely upon the assumption* that any child of sufficient age to be al-

---

**26.** Defendant suggests that under § 339(a), "it is not necessary that the minor plaintiff realize the *precise* injury or harm that occurs." Defendant's Memorandum at 26. Defendant contends that, although plaintiff may not have realized the dangers inherent in the catenary wires, he certainly realized and must be charged with appreciation of the dangers involved in climbing to the top of a 14-feet-tall railroad car. *Id.* at 25–27. This view of § 339(c) is too broad in the context here. Although a plaintiff need not foresee "the exact accident" or "particular method" by which a danger will result in harm, *see Alston, supra* note 22, 433 F.Supp. at 569–70 n. 102, the plaintiff still must perceive the specific *danger* for § 339(c) to be unfulfilled. Plaintiff was

injured by the high-voltage electricity in the wires, and not by falling from the top of the car, and it is the danger of the wires, and not of falling, that is at issue here.

**27.** Plaintiffs characterize the train upon which plaintiff was injured as a "parked" train, again without citing any factual support. Pretrial Brief at 194–95. This is simply contrary to the undisputed material facts that the train was en route and only stopped for twenty minutes for a signal at the Virginia Avenue tunnel. Accidents involving trains that had been parked or stored for long periods of time are inapposite to plaintiffs' case. *See infra* pp. 1106–1107.

lowed at large by his parents, and so to be at all likely to trespass, will appreciate the danger [of moving trains] and avoid it.' " 431 A.2d at 603 (quoting *Prosser, supra,* at 371) (emphasis supplied). Defendant was therefore entitled to assume as a matter of D.C. law that, if any children were in the area where plaintiff was injured, they would not climb onto the moving through trains there.

The usual absence of stationary means of access and the normal presence only of moving through trains are thus undisputed. These facts preclude a reasonable trier of facts from finding that catenary wires suspended 18½ feet in the air posed a danger that Conrail "realize[d] or should [have] realize[d] will involve an unreasonable risk" to children under § 339(b). The risk was not "unreasonable" but, rather, was unlikely, and no facts in the record suggest that defendants should have "realized" otherwise.

Plaintiffs attempt to fill this void in their case by proffering evidence of other prior catenary injuries to children in the District of Columbia, including live or videotaped testimony by surviving victims. Although plaintiffs have made no effort to explain the specific purpose for which they would seek to admit this evidence, it could only be for two interrelated purposes, both under § 339(b): to show the "unreasonable risk" posed by the wires and to show that defendant "ha[d] reason to know" that the wires posed such a risk.[28]

■ Evidence of prior accidents is generally admissible in the District of Columbia "to show defendant's notice or knowledge of the ... dangerous condition [that] caused the accident." *Hecht Co. v. Jacob-*

sen, 180 F.2d 13, 17 (D.C.Cir.1950); *accord, Capital Traction Co. v. Copland,* 47 App. D.C. 152, 156–58 (D.C.App.1917). Such evidence is also admissible to show the dangerous nature of the specific condition at issue. *District of Columbia v. Armes,* 107 U.S. 519, 524–25, 2 S.Ct. 840, 844–46, 27 L.Ed. 618 (1883); *Myers v. Capital Transit Co.,* 126 F.2d 231 (D.C.Cir.1942). (Although defendant does not dispute that catenary wires are dangerous in themselves, it does dispute whether they posed an unreasonable danger in this case, 18½ feet in the air).

■ However, as Professor Wigmore has recognized, basic considerations of relevancy "require[ ] that other instances of injuries received should have occurred under *substantially similar circumstances.*" 2 Wigmore, *Evidence* § 458, at 573 (Chadbourn rev. 1979) (emphasis in original). "The requirement of similarity of conditions is probably at its strictest" when evidence is sought to be admitted to show the dangerousness of a particular condition or situation, although it is then "much relaxed" when the evidence is proffered to show notice. *McCormick, supra* note 28, § 200 at 475.

■ The requirement of substantially similar circumstances as a precedent to admission of prior accidents is adhered to in the District of Columbia. *See, e.g., Hecht Co. v. Jacobsen, supra,* 180 F.2d at 17 ("similar circumstances"); *Hackett v. District of Columbia,* 264 A.2d 298, 300 (D.C.App.1970) (excluding evidence of prior accident because "there was no proof that ... the same condition[s] existed at the time of both accidents"); *Dunn v. Evening Star Newspaper Co.,* 232 A.2d 293, 297 n. 8 (D.C. App.1967) ("unity of circumstances" is "re-

---

**28.** McCormick suggests that evidence of "other similar accidents" may generally be probative on four points: to show (1) that a particular condition *exists;* (2) that a particular condition *caused* a plaintiff's injury; (3) that a particular condition is *dangerous;* or (4) to show a defendant's *knowledge* of the danger. *McCormick's Handbook of the Law of Evidence* § 200 (E. Cleary ed. 1972); *see also* 22 Wright &

Graham, *Federal Practice and Procedure* § 5170 (1978). In this case, defendant concedes that the high-voltage catenary wires exist and that they caused plaintiff's injury. What is contested is whether they had reason to know that wires suspended at 18½ feet above through tracks would pose an unreasonable risk to children; this issue turns on the last two points suggested by McCormick.

quired" for admission). Temporal, as well as physical, conditions must be substantially similar before evidence of prior accidents will be admitted. *See Hampton v. Kroger Co.,* 618 F.2d 498, 499 (8th Cir.1980) (per curiam) (prior accidents should be "similar in time, place [and] circumstances to be probative"); *Sears, Roebuck & Co. v. Copeland,* 110 F.2d 947, 949 (4th Cir.1940) (prior accidents must have occurred "under substantially the same conditions, at substantially the same place . . ., and at a time not too remote"); *see generally* Annot., 70 A.L.R.2d 167, 208 (1960). Thus evidence of accidents that were remote in time to the one under examination may be excluded. *See, e.g., Small v. Pennsylvania R. Co.,* 80 F.2d 704 (D.C.Cir.1935) (evidence of accident at same railroad crossing 11 years earlier excluded); *Stewart v. State,* 92 Wash.2d 285, 597 P.2d 101, 112 (Wash.1979) (*en banc*) (excluding evidence of similar automobile accident three years earlier because roadway surface had been changed in the interim).

The rationale for excluding evidence of prior accidents that happened under dissimilar or remote circumstances is a matter of logic: as time and circumstances become less similar to the accident under consideration, the probative value of the occurrence of such prior accidents decreases, while the prejudicial value of such evidence before a jury remains high. The value of such evidence is that, when prior accidents have occurred under similar circumstances, the accidents and knowledge of them "operate[ ] as a standard against which can be tested the reasonableness of the defendant's conduct." *Julander v. Ford Motor Co.,* 488 F.2d 839, 846 (10th Cir.1973). But "such evidence should be carefully exam-

ined *before being received* to the end that the circumstances of the 'other accident' bear similarity to the circumstances surrounding the accident" at issue. *Id.* at 846–47. This is because such evidence can be unfairly prejudicial; "the jury might infer from evidence of the prior accident alone that ultra-hazardous conditions existed at the site and were the cause of the later accident without those issues ever having been proved." *Gardner v. Southern Railway Systems,* 675 F.2d 949, 952 (7th Cir. 1982) (per curiam); *accord, Robitaille v. Netoco Community Theatres,* 305 Mass. 265, 25 N.E.2d 749 (Mass.1940).

■ Finally, "[t]he question whether evidence is too remote is in all cases to be determined by the court," not the jury. *United States v. Maryland and Virginia Milk Producers Ass'n.,* 20 F.R.D. 441, 442 (D.D.C.1957) (Holtzoff, J.). The Federal Rules of Evidence give to the Court the power and discretion to rule on the evidence and exclude irrelevant, unfair, confusing or misleading evidence. *See* Fed.R.Evid. 401– 403. Thus "[e]ven when substantial identity of the circumstances is proven, the admissibility of such evidence lies within the discretion of the trial judge who must weigh the dangers of unfairness, confusion, and undue expenditure of time." *McKinnon v. Skil Corp.,* 638 F.2d 270, 277 (1st Cir.1981).

■ Given these general guidelines, it is clear that the only two prior accidents that are even arguably admissible are the Fearing accident of 1973 and the Windom accident of 1968. The other prior incidents occurred at locations and under circumstances far from and totally dissimilar to the site at which plaintiff was injured.[29]

---

**29.** The burden to prove substantially similar circumstances for the purpose of admitting prior accidents is on the party seeking admission. Once again, plaintiffs have failed to provide any but the most cursory factual accounts of these prior incidents. Defendant has also provided accounts of the prior incidents which are not incompatible with plaintiffs' facts, but which provide more detail. *See* Defendant's

Reply (Attachment: Memorandum on Admissibility at 2–3); Defendant's Answers to Plaintiffs' Second Set of Interrogatories, ¶¶ 1–12. Independent evidence confirms some of defendant's accounts, *see, e.g.,* Troop deposition; Windom deposition, and plaintiffs have not contested defendant's more detailed proffers. Because the decision regarding admissibility is

For example, the Throop incident in 1978 and the Morris/Zilko accident in 1971 occurred on top of railroad cars that were stored for long periods of time in open yards that lacked any barriers to access and were immediately adjacent to a commercial parking lot and 1½ blocks from the District of Columbia Air and Space Museum which thousands of children visit each year. The Sligh and Sounder accidents in 1978 occurred in an unfenced railroad storage yard upon railroad cars parked only fifty feet from a high-density housing development. Daniel Morgan and Theodore Hansen were riding *moving trains* when, in 1977 and 1978 respectively, they were injured by catenary wires. Edwin Reigle was injured by catenary wires in 1962 when he *jumped off* of the Sousa Bridge onto a passing railroad car, an incident totally dissimilar from plaintiff's.

The site at which plaintiff's accident occurred is a discrete one, bounded on two sides by a river, another by a tunnel and the Southeast Freeway, and partially on the fourth side by the fenced Congressional cemetery. The only point of access about which plaintiffs have proffered evidence is the road that runs one-half mile from RFK Stadium to the railroad track area. Furthermore, the railroad tracks there are through tracks that commonly do not have standing trains on them. All these factors go to access to the site and to the wires, and ease of access is a very relevant consideration with regard to defendant's notice and alleged realization of the danger at that site. Thus any notice that defendant may have had regarding children who had previously climbed on top of trains standing in storage yards at other areas in the District of Columbia located near houses or museums with no fences or other natural bars to access to the tracks is not relevant to defendant's knowledge or realization of the likelihood that children would be injured by a catenary wire at the site of plaintiff's accident. On grounds of relevancy, therefore, evidence of these prior accidents would not be admissible at trial under § 339.[30] The facts of these accidents are consequently not material for purposes of summary judgment.

Evidence of the Fearing and Windom accidents would be barred at trial as well, although they occurred on standing cars near the discrete site where plaintiff was injured. Plaintiffs' proposed manner of introduction, live testimony, would clearly be prejudicial; at least one of the young men lost a limb as a result of the catenary accident. A sanitized written stipulation would be inadmissible as well, however, for the simple reason that these two accidents are irrelevant to the issue of defendant's knowledge in 1979 due to their remoteness in time and a major change in the circumstances relating to access to the site. Both of these boys were injured prior to the construction of the Southwest Freeway in 1974. That highway now separates the site from the nearby housing area with many lanes of high-speed traffic. Jeffrey Windom came to the site directly from those houses; in fact, he was attracted to the site by the ongoing construction and piles of dirt which he went to play on.[31] Windom Deposition at 15, 27–28; *Windom, supra,* transcript at 411. Neither party has produced any evidence as to how William Fearing gained access to the site. But two facts are clear: access to that site was made much more difficult after 1974 by construction of the Southwest Freeway, and no catenary accidents occurred at that site after the freeway was constructed until plain-

---

for the Court in any case, defendant's uncontested details as well as plaintiffs' accounts have been relied upon in the text that follows.

**30.** The possibility that plaintiffs would seek to introduce such evidence of prior accidents at trial by live or videotaped testimony by the surviving victims, a tragic and compelling, but irrelevant sight, simply compounds the inadmissibility of such evidence.

**31.** It must not be forgotten that even in the Windom case, judgment was granted for the defendant railroad as a matter of law. *See supra* p. 1097.

tiff was injured. *See supra,* note 15. Thus, once the freeway was constructed, the conditions were substantially different from those that prevailed when the prior accidents occurred. *Compare Stewart v. State,* 92 Wash.2d 285, 597 P.2d 101, 112 (Wash. 1979) (barring evidence of similar automobile accident 3 years earlier because the roadway surface had been changed in the interim). For that reason, and taking into account the inherent prejudicial effect of evidence of any prior accidents (*see supra* pp. 1106–1107), the pre-1974 accidents would be inadmissible at trial on the issues of defendant's knowledge or realization of the risk in 1979.

■ Even if the Fearing and Windom incidents were admissible for the limited purpose of showing that two prior catenary incidents had occurred at the site in the 11 years before plaintiff's accident, a jury could not rationally find that only two incidents in 11 years, both occurring before construction of the Southwest Freeway, put defendant on notice that after the freeway was constructed, its catenary wires at that point constituted an unreasonable risk of harm to minors. A catenary incident had not occurred at or near the site where plaintiff was injured for six years (1973–79), and none had ever occurred after the freeway blocked easy access to the site from the housing nearby. Subsection (b) of § 339 must be read to involve some requirement of reasonable foreseeability or probability; a theoretically possible risk cannot be "unreasonable" without consideration of the probability of its recurrence. *Cf. City of Los Angeles v. Lyons,* —— U.S. ——, —— n. 8, 103 S.Ct. 1660, 1668 n. 8, 75 L.Ed.2d 675 (1983) (the "reasonableness" of a plaintiff's alleged fear of involvement with police "is dependent upon the likelihood of a

recurrence of the allegedly unlawful conduct"). Absent *any* similar injuries at the site since the freeway was built, defendant cannot be charged with "realization" that the catenary wires posed an "unreasonable risk." On the undisputed facts thus considered, defendant had no reason to know that its catenary wires posed an unreasonable risk in 1979 and judgment for defendant is appropriate as a matter of law under Restatement § 339(b). *See W. Schwartzer, Managing Antitrust and Other Complex Litigation* 41–42 (1982).

Finally on this point, there are many venerable precedents finding as a matter of law that, under the "attractive nuisance" doctrine, injuries to child trespassers from electrical wires suspended high above the ground cannot normally provide a basis for tort liability. *See, e.g., New York, New Haven & Hartford R. Co. v. Fruchter,* 260 U.S. 141, 43 S.Ct. 38, 67 L.Ed. 143 (1922); *Rasmussen v. Palmer,* 134 F.2d 780 (2d Cir. 1943) (Chase, J.); *Brown v. Potomac Electric Power Co., supra; Dugan v. Pennsylvania Railroad Co.,* 387 Pa. 25, 127 A.2d 343 (Pa.1956), *cert. den.,* 353 U.S. 946, 77 S.Ct. 825, 1 L.Ed.2d 856 (1957); *Musser v. Norfolk & W. Ry. Co.,* 122 W.V. 365, 9 S.E.2d 524 (W.V.1940); *Salt River Valley Water Users' Ass'n v. Compton,* 39 Ariz. 491, 8 P.2d 249, *aff'd on rehearing,* 40 Ariz. 282, 11 P.2d 839 (Ariz.1932); *McDonald v. Shreveport Rys. Co.,* 174 La. 1023, 142 So. 252 (La.1932); *Burns v. City of Chicago,* 338 Ill. 89, 169 N.E. 811 (Ill.1929) (per curiam); *Reddy v. City of Watertown,* 53 S.D. 347, 220 N.W. 851 (S.D.1928); *Mobley v. City of Monroe,* 37 Ga.App. 364, 140 S.E. 516 (Ga. 1927). Plaintiff has not cited a single case holding to the contrary and the Court has discovered only one, which is clearly distinguishable both on the law and its facts.[32] Given plaintiff's facts in this case, Justice Cardozo's discussion, speaking for the New

---

**32.** The Court's extensive search has uncovered only one reported decision involving somewhat similar facts in which the issue of liability was held to be for the jury. In *Scurti v. City of New York,* 40 N.Y.2d 433, 387 N.Y.S.2d 55, 354 N.E.2d 794 (N.Y.App.1976), a 14-year-old boy was electrocuted when he climbed on top of a

freight car and touched catenary wires suspended overhead. The freight car was in a railroad yard and not briefly stopped on through tracks, thereby distinguishing *Scurti's* facts from plaintiffs. In addition, there had been four similar accidents at that particular yard in the four years prior to plaintiff's acci-

York Court of Appeals in 1919 in a similar case, is still appropriate today:

> There was, of course, a duty to adopt all reasonable precautions to minimize the resulting perils. We think there is no evidence that this duty was ignored. The trolley wire was so placed that no one [normally] could reach it. Only some extraordinary casualty, not fairly within the area of ordinary prevision, could make it a thing of danger. Reasonable care in the use of a destructive agency imports a high degree of vigilance. But no vigilance, however alert, unless fortified by the gift of prophecy, could have predicted the point upon the route where such an accident would occur. It might with equal reason have been expected anywhere else.

*Adams v. Bullock,* 227 N.Y. 208, 125 N.E. 93, 93 (N.Y.App.1919) (citations omitted).

### 2. Section 339(d)

 Subsection (d) of § 339 requires that, for liability to attach in a child tres-

passer case, both the "utility" of the dangerous condition and the "burden of eliminating the danger" must be "slight" when compared to the "risk to children involved." The utility of the catenary wires to defendant is clear and considerable; the wires are necessary to provide power to enable defendant to run its interstate trains. The physical and financial burden on defendant of "eliminating" the wires and changing completely to another system of power obviously would be prohibitive, and plaintiffs have not even suggested such a wholesale change.[33] As to the risk involved, the analysis of the evidence under § 339(b) made above, *supra* pp. 1104–1109, indicates that the risk of harm posed by the catenary system to child trespassers at the site where plaintiff was injured is "slight" by any standard.[34] The very low risk that accidents such as this one will occur is evidenced by the uncontroverted testimony of defendant's Assistant Vice-President that, generally, "catenary accidents comprise ap-

---

dent, unlike the six-year accident-free period here. In *Scurti,* New York's highest court decided to *abandon* the attractive nuisance doctrine of § 339, thereby overruling a number of prior cases, and adopt the very same "reasonable care under the circumstances" standard that was considered and rejected by the D.C. Court of Appeals in *Holland, supra.* Applying this more flexible standard which has been authoritatively rejected in the District of Columbia, the *Scurti* Court ruled that "in this particular case the question of the reasonableness of the parties' conduct cannot be resolved as as matter of law." 387 N.Y.S.2d at 438, 354 N.E.2d at 799. The *Scurti* court also noted, however, that even under the less stringent reasonable care standard, not every case "raises a factual question for the jury's consideration," *id.,* 387 N.Y.S.2d at 437, 354 N.E.2d at 798, thereby recognizing the propriety of summary judgment under less favorable facts.

**33.** On March 28, 1983, the defendant deposed K.R. Shah, a doctor of electrical engineering, who evidently was identified as one of plaintiffs' expert witnesses. Plaintiffs, however, have not cited to any of Dr. Shah's deposition testimony nor have they even mentioned him in support of their opposition to defendant's motion for summary judgment. Therefore the Court may disregard his deposition testimony. In any case, his testimony is much too vague and speculative to provide any support for plaintiffs' case under § 339. First, Dr. Shah

stated in deposition that he could design a catenary system in which a person contacting it "would not be electrocuted" and "may not be receiving as much electric shock." Shah Deposition at 36. Thus his testimony did not relate to "elimination" of the danger posed by catenary wires, as required under § 339(d). Second, Dr. Shah repeatedly stated that he did not have sufficient information to make a cost estimate, even a general one, regarding such a system. *Id.* at 25, 29, 58, 62 & 75. He noted that "many" relevant pieces of information were "missing" from his analysis at that time. *Id.* at 32. Thus his testimony could not support a cost-benefit analysis under § 339(d). Third, his testimony appears to have been related to the *design* of such a system, and not the cost or logistic burdens involved in installing or maintaining the system. For these reasons, Dr. Shah's deposition testimony is largely irrelevant to the inquiry under § 339(d), and in no way does it create a genuine issue of material fact as to the cost of a "safe" catenary system.

**34.** Subsection (d) of § 339 does *not* mandate that if injury is certain when the wires are touched then the risk must be calculated as great, as plaintiffs appear to suggest in their pretrial brief at 195. This argument omits from the equation the factor of the possibility and likelihood of access to the wires. The question is not whether the harm itself is great, but whether the *risk* of that harm actually occurring is great. Although the harm to plaintiff in

proximately 0.01% of all [railroad] accidents." Defendant's Memorandum in Support at 30 n. 25; Gregory Deposition at 79–84.

Even if the risk of harm in this case is not considered to be prohibitively low, the analysis under subsection (d) requires a balancing of the burden to defendant of taking steps to eliminate accidents such as plaintiff suffered, against the risk of such accidents actually occurring.[35]

Plaintiffs' only proffered evidence under § 339(d) is a factually unsupported statement that defendant could have "purchased" enough warning signs to post one on each side of the track every 25 feet along its 17.7 miles of electrified track in Washington, D.C., at a cost of $30,000. Pretrial Brief at 195. The cost of installing and maintaining such signs is not estimated by plaintiffs; no witness or other factual basis is proffered as support for the estimate. It is again clear that plaintiffs have generally failed to meet the minimal requirements of Rule 56(e), see supra, pp. 1091–1092, by their failure to support this alleged cost estimate either in their opposition to the summary judgment or in their pretrial brief. One incomplete and unsupported estimate (which is the only specific cost estimate of any kind proffered by plaintiffs) is totally insufficient to put at issue a material fact for trial.

Even assuming that plaintiffs' signing cost estimate included the cost of installa-

tion and maintenance and were competent under Rule 56(e), it simply does not create a jury issue under § 339(d). The facts are undisputed that there was already a "No Unauthorized Vehicles" sign posted along the road that plaintiff travelled to the site, and there were "No Trespassing" warnings stencilled on the catenary poles at the site. The undisputed evidence supplied by plaintiff and plaintiffs' proffered expert witnesses, however, is that signs by themselves do not deter children in general, and did not deter this plaintiff in particular, from proceeding past them. Plaintiffs themselves adduced expert testimony as to the general point, see Fraad Deposition at 13–14; Rosenfeld Deposition at 17–18. As Judge Richey held in directing a verdict for Penn Central Railroad in the factually similar case of *Windom v. Penn Central, supra:* "As a practical matter, it is not possible for the railroad to prevent a child from approaching the railroad tracks and climbing on cars, if the child is determined to do so." *Windom* Transcript at 261 (Attachment to Defendant's Memorandum). As to this particular case, plaintiff's companion Tryone Brown saw the "No Unauthorized Vehicles" sign but paid it no attention and did not even call it to his companions' attention. "No trespassing" signs already *were* posted at this site; they did not stop the plaintiff.[36] The undisputed material evidence therefore establishes that signs alone would not "*eliminat[e]* the danger" within the mean-

---

this case was undeniably great, one catenary accident in six years (1973–79) indicates that the risk of that harm occurring to children is slight.

**35.** No evidence at all on this issue is cited in plaintiffs' opposition to summary judgment; their only statement is that "[p]laintiffs ... contend that the burden ... as compared to the danger to children is slight," with reference to "plaintiffs' engineer, sign company representative, fencing company representative, and others." *Id.* at 5. These persons are not identified by name in any of plaintiffs' pleadings, and no depositions of such persons have been brought to the Court's attention. Plaintiffs' pretrial brief is not much better: it alleges that defendant's decisions as to fencing and other protective devices were based on erroneous "economic assumptions," without supplying

any supporting evidence or counter-arguments, and specific figures are provided only with regard to putting up signs warning of the danger. Pretrial Brief at 195. This "evidence" amounts to all of one page in the 225-page brief. As discussed in the text, it simply does not create a material issue of fact capable of justifying a jury trial.

**36.** Plaintiffs argue here that defendant should have posted signs that warn specifically against the danger of the high-voltage catenary wires. But as defendant points out, there are many dangers associated with railroad tracks, and catenary accidents are not the most common. Rather than put up a specific sign warning against each particular danger at a site, defendant posts "No Trespassing" warnings which, *if obeyed,* protect against all the myriad dangers. Plaintiffs suggested signs would be no more

ing of subsection (d) (emphasis supplied), and plaintiffs' proffer as to the burden of putting up such signs is therefore irrelevant as well as insufficient.

Moreover, the burden on this defendant to protect against a particular danger must be considered on a system-wide level, and not just with regard to a particular location or a particular city or state. Given that the site of plaintiff's accident was not a storage yard or side track, there was no way for defendant to pinpoint it as a site more "likely" to have such an accident occur than many other urban rights-of-way. Therefore, as the Pennsylvania Supreme Court has noted,

> It is, of course, obvious that if there were imposed upon the defendant the requirement of fencing the place where this accident occurred, it would likewise be subject to the duty of fencing the innumerable places along its many miles of tracks frequented by trespassing children.

*Dugan v. Pennsylvania RR,* 387 Pa. 25, 127 A.2d 343, 348 (Pa.1956), *cert. den.,* 353 U.S. 946, 77 S.Ct. 825, 1 L.Ed.2d 856 (1957). The cost of such protective measures is arguably prohibitive, and at the very least not "slight" as a matter of law under § 339(d). For example, defendant proffers without dispute from plaintiffs that it would cost over $2.5 billion to fence Conrail's 33,529 miles of track. Memorandum in Support at 30 n. 23. Plaintiffs' $30,000 cost estimate for signs is restricted to the District of Columbia tracks alone, and is on this ground as well deficient under § 339(d). Moreover, even fencing, like signing, is not "child-proof," *see Nolley v. Chicago M. St. P. & P. Railroad Co.,* 183 F.2d 566, 569 (8th Cir.1950), *cert. den.,* 340 U.S. 913, 71 S.Ct.

284, 95 L.Ed. 660 (1951); in fact, fencing can create other problems or dangers of its own. *See* Hasselman Deposition at 98–103.

The opinion of the Pennsylvania Supreme Court in the *Dugan* case, *supra,* is most persuasive on this point. The *Dugan* court held as a matter of law under Restatement § 339(d) that to extend liability to a railroad for catenary injuries to child trespassers along urban rights-of-way "would inordinately burden the operation of the railroad" and "would impose upon railroads a heavier burden than they can justly be expected to bear." 127 A.2d at 349. The court therefore reversed a jury verdict that had been returned for the plaintiff in a case factually similar to the instant one.[37] *Dugan's* rationale has had considerable impact on the legal analysis of child trespasser tort cases. The authors of the Restatement (Second) of Torts relied upon *Dugan* when they revised the language of § 339(d) to include consideration of "the social utility" of activities that may pose some danger to child trespassers. *See* § 339, Appendix at 131 (Reporter's Notes, # 4). Likewise the *en banc* D.C. Court of Appeals cited *Dugan* in *Holland, supra,* to support its statement that "in the absence of statutory requirements railroads are generally under no duty to erect fences or maintain other safeguards." 431 A.2d at 603 n. 11. That statement, although dictum, was concurred in by the three dissenters with regard to "many if not most locations." *Id.* at 604 (Ferren, A.J., dissenting).

Defendant must select priorities for protecting against accidents, and cannot protect against them all without an unbearable burden to itself, and thereby to a rail system which is a vital public necessity. As

---

effective than defendant's, and perhaps less so, if children chose to ignore them.

**37.** In *Dugan,* the plaintiff was an eleven and one-half year-old boy who was seriously injured when he climbed onto a railroad car "temporarily stopped at a signal on [a] main line track[]" and waved his hand close to the catenary wire suspended above the car, receiving a great electric shock. 127 A.2d at 344–45.

The railroad car was located less than 100 feet from a school's property, and children were well known to play near the railroad tracks, and even to climb "over the top of boxcars." *Id.* Thus the facts of *Dugan* were even more favorable to the plaintiffs than are the facts in the instant case. Yet the Pennsylvania Supreme Court held that the plaintiff could not recover under § 339 as a matter of law.

**1112**

noted above, p. 1095, the Federal Railroad Administration has not imposed an obligation on railroads to fence their urban rights-of-way, noting the high cost that such a requirement would involve. The Secretary's stance and the adoption of *Dugan* by the authors of the Restatement and of the *Holland* decision, taken together with all the other factors discussed above under § 339(d), establish as a matter of law that neither the utility of the catenary system nor the burden of eliminating its dangers is "slight" when compared to the risk of an injury such as was regrettably incurred by this plaintiff. On the undisputed material facts in this record, no rational dispute is presented for a jury as to this conclusion.

### 3. *Section 339(e)*

■ Even if all the other conditions of § 339 were satisfied by plaintiffs' case, "there is liability *only* if the possessor fails to take the steps which a reasonable man would take under such circumstances. If the possessor has exercised all reasonable care ..., and still has not succeeded, there is no liability." Restatement (Second) of Torts § 339, comment (*o*). Professor Prosser has commented in this regard that "[s]uch things as standing freight cars ... are undeniably attractive to children, but are socially useful and very difficult to safeguard, and so may call for very little in the way of care." Prosser, *supra,* at 375.

As noted above, *supra* p. 1098, the D.C. Court of Appeals stated as an alternate ground for its holding in *Holland* that "in the absence of statutory requirements railroads are generally under no duty to erect fences or maintain other safeguards," and that the allegations of a nine-year-old child trespasser injured on defendant's railroad tracks did "not satisfy the requirements of the Restatement rule [§ 339]." 431 A.2d at 603 n. 11. It is uncontested that Conrail was in compliance with all applicable statutes and safety regulations with regard to its Washington, D.C., tracks on the date of plaintiff's accident, and that there was no

statutory requirement that it fence the tracks or post signs where plaintiff was injured. Thus the dictum in *Holland* indicates that as a matter of District of Columbia law, defendant exercised reasonable care under § 339 with regard to the location at issue here.

Moreover, the considered decision of Congress and the FRA not to require fencing or signs at urban rights-of-way is further persuasive and uncontested evidence that defendant was exercising reasonable care at the site at issue. As Justice Holmes noted long ago, "what is usually done may be evidence of what ought to be done." *Texas & P. Ry. Co. v. Behymer,* 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903). At the point where plaintiff was injured the wires could not be de-energized, if the 20–28 through trains that pass by each day were to have power to operate. Defendant was in compliance with all statutes and regulations at that point, and had no reason to suspect that that particular location was any more likely to have a catenary accident occur than any other used by through trains along its lines. Finally, at different sites on the Conrail line where trains stand for long periods or where the catenary wires are not beyond normal reach (such as at bridges or where cables may go underground), thereby making injurious contact more likely and foreseeable, it is undisputed that defendant has a policy of either fencing the surrounding area or of de-energizing the wires. Plaintiffs' Pretrial Brief at 16, 19–20, 67, 69 (summarizing testimony of witnesses Schertzer, Ginter and Hasselman); *see also* Defendant's 9(h) Statement, ¶ 14. It is therefore, in effect, conceded that defendant has taken reasonable precautions to protect against the risk of harm from catenary wires where it is reasonably foreseeable that such harm might occur. In light of all these uncontested facts, defendant did as a matter of law exercise all reasonable care with regard to the site of plaintiff's accident, and no rational jury could find to the contrary.

### V

■ Plaintiffs have totally ignored defendant's comprehensive proffers of evi-

dence and arguments directed at subsection (e) of § 339, as they have on other points. They assert, without citing specific facts and without further argument, that the issues "are properly for resolution by the trier of fact, the jury." Plaintiffs' Opposition (May 11, 1983) at 5. In many cases, it is true that reasonableness is an issue of fact. However, when all the material facts are undisputed and before the Court on summary judgment, reasonableness may be "a question of law where only one inference is possible from the evidence." *Quinto v. Legal Times of Washington*, 506 F.Supp. 554, 564 (D.D.C.1981) (Flannery, J.); *accord, Zweig v. Hearst Corp.*, 521 F.2d 1129, 1134–36 (9th Cir.), *cert. den.*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); W. Schwartzer, *Managing Antitrust and other Complex Litigation* 42 (1982). *See also Halperin v. Kissinger*, 606 F.2d 1192, 1209 (D.C.Cir.1979) (subjective good faith may be determined on summary judgment), *aff'd in part, cert. dismissed in part*, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981) (per curiam); *Flying Diamond Corp. v. Pennaluna & Co., Inc., supra*, 586 F.2d 707, 713 (absence of negligence may be determined on summary judgment).

A case in point is *Bloomgarden v. Coyer, supra*, 479 F.2d 201 (D.C.Cir.1973). In *Bloomgarden,* our Court of Appeals approved a grant of summary judgment based on determination of the plaintiff's state of mind or intent, which is normally a factual issue. Upon review of the undisputed material facts, the Court held that "[t]here simply was no basis on which a jury could rationally find" other than what the district court had determined, and summary judgment was therefore appropriate to avoid a "useless trial." *Id.* at 206, 212. This case is similar, although of course not identical. Defendant has produced a wealth of evidence, and plaintiffs have responded with little more than bare assertions; unlike the plaintiffs in *Neumann v. Vidal*, 710 F.2d 856, No. 82–1685 (D.C.Cir. June 21, 1983), no affidavits have been submitted to factually traverse defendant's motion. No disputes

as to *material* issues are supported by plaintiffs' submissions or by the record that the Court has reviewed. Careful consideration of the relevant legal standards, based on the undisputed material facts, leads to the unavoidable conclusion that no rational jury could return a verdict for plaintiffs under the law of the District of Columbia, that is, Restatement (Second) of Torts § 339. Judgment for defendant is therefore appropriate.

In granting this summary judgment for defendant, the Court is respectful of Judge Gasch's statement that "the summary judgment stage is an inappropriate juncture for the determination of issues such as" these. *Alston v. Baltimore and Ohio Railroad Co., supra*, 433 F.Supp. at 557 (granting directed verdict for defendant in child-trespasser case). But a number of factors make summary judgment the preferred and clear course in this case. First, the local law to be applied in a case like this is now established, unlike the state of the law in the District of Columbia prior to *Holland* when *Alston* was decided. The Court has given great weight and deference to the *en banc* decision of the D.C. Court of Appeals in *Holland, supra.* The concurrences of the majority and the dissent there make it clear, *inter alia,* that courts governed by District of Columbia law may decide cases under § 399 as a matter of law; *Holland* itself affirmed a grant of summary judgment in favor of the railroad under § 399 and the dissent recognized the propriety of summary judgment in case-by-case applications of § 339. Other courts have granted judgments as a matter of law in similar cases. *See* cases cited *supra* p. 1105.

Most significantly in this case, the plaintiffs have conducted massive discovery in an attempt to develop favorable evidence for trial. Defendant has responded to hundreds of interrogatories and requests for admission, permitted plaintiffs' attorneys to search through literally acres of company

records, and produced scores of persons for depositions. Discovery lasted over six months and plaintiffs have filed a 225-page pretrial brief. As discussed in detail above, the few actual facts stated therein do not set up material disputes to the undisputed evidence proffered by defendant. Plaintiffs cannot be permitted to avoid summary judgment after such lengthy and intensive discovery and pretrial briefing "on the mere promise that a more substantial showing will be made" at trial. *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C. Cir.1977); *see First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). Judge Gasch has elsewhere noted that if plaintiffs fail to place in the record particular facts that might be more favorable to them, then they "must assume the risk of whether [defendant's] facts are sufficient to support" summary judgment. *Business Equipment Center Ltd. v. DeJur-Amsco,* 465 F.Supp. 775, 783 (D.D.C.1978).

In addition, in this case the parties received a detailed seven-page Pretrial Order that made it clear that the pretrial briefs should fully "show the hand of each party" and that a party who "held back" evidence did so at his peril. The Pretrial Order provided that:

> Any fact, legal contention, claim for relief, . . . or affirmative matter not set forth in detail [in the pretrial briefs] shall be deemed abandoned, uncontroverted, or withdrawn (as may be appropriate) in future proceedings, . . . except for matters of which a party could not have been aware in the exercise of reasonable diligence at the time the pretrial brief was filed. Such a showing as to new matter shall be made by motion.

Pretrial Order ¶ 11 (filed Sept. 22, 1982). Plaintiffs have made no motion to introduce new factual matter at trial and the Court must presume that they have none. The purpose of pretrial briefing is to fully expose the proffered facts of each party to the knowledge and opposition of the others, thereby avoiding surprise, permitting irrelevant issues to be disposed of, and streamlining the time and expense of trial if necessary. Plaintiffs are therefore bound to their pretrial brief, and would be barred from producing other evidence at trial which was not proffered in that document or otherwise readily apparent from the record.

The Court has reviewed the extensive record in this case with a more favorable eye toward plaintiffs' case than their pleadings would warrant. As a matter of law, defendant cannot be held liable in this case under a number of factors under § 339, and the failure to fulfill any one of those factors requires summary judgment. While summary judgment normally should be granted only reluctantly, it is warranted in exceptional cases where only one result or inference is possible under any view of the undisputed evidence. *See Quinto v. Legal Times of Washington, supra,* 506 F.Supp. at 564. The Court feels sympathy for the minor plaintiff's injuries, but as a matter of law he cannot recover on this record.

For all the reasons discussed above, an accompanying Order therefore grants defendant's motion and orders that the action be dismissed.

### ORDER

For the reasons stated in the accompanying Memorandum, it is this 7th day of July, 1983, hereby

ORDERED: that defendant's Motion for Summary Judgment is GRANTED; and it is further

ORDERED: that this matter be DISMISSED with prejudice.